John Peddicord vs. The Baltimore, Catons-
ville and Ellicott's Mills Passenger Rail-
way Company.

*Turnpike Company—Rights and Powers—Passenger
Railway Company—Easement—Servitude—Use in
a Highway—Adjacent Property holders—Compen-
sation—Construction of Contract—Abandonment of
a Power.*

By the Act of 1787, ch. 23, Commissioners were appointed to survey and lay out a public road from Baltimore to Frederick, sixty-six feet wide, and to cause the same to be cut down and well cleared fifty-two feet wide, and grubbed and stoned forty-feet wide, and to agree with the proprietors of lands through which the road might pass, as to the compensation to which they might be entitled, for damages occasioned by the passage of the road through their lands, and in case of inability to agree, to cause the same to be ascertained by an inquisition. The Act of 1801, ch. 77, recited that the said road had been surveyed and laid out, and by its fourth section authorized the supervisor, appointed by the Act, to cause the road to be cleared to the width of sixty-six feet, and to have twenty-one feet, at least, bedded with wood, stone, gravel, &c. By the Act of 1787, the road was to be forever afterwards, taken, held and adjudged in all Courts of Law and Equity, a public road and common highway. By both Acts, the jury of inquisition was to take into consideration the convenience and benefit, and the disadvantages occasioned to owners of land by reason of the passage of the road through their lands. By the Act of 1804, ch. 51, the President, Managers and Company of the Baltimore and Frederick Town Turnpike Company were incorporated and empowered to construct a road over the bed of the road provided for in the Acts of 1787 and 1801. The seventeenth section of this last Act, provided that twenty feet *at least* should be bedded with wood, stone or gravel, &c., *so as to secure a surface so nearly level, that it should not rise above or fall below an angle of four degrees with a horizontal line,* except in crossing the mountains mentioned in the Act. By the Act of 1809, ch. 2, the turnpike road as it then stood was confirmed, and by the supplementary Act of 1811, ch. 202, the road was again confirmed. By the Act of 1860, ch. 34, a company was incorporated, and authorized, the assent of the turnpike company being first obtained, to construct a passenger railway, by horse power, from Baltimore to Ellicott's Mills, upon the bed of the turnpike, *with power to*

*alter the grade thereof.*   Subsequently an agreement was entered into between the turnpike company and the Passenger Railway Company by which the latter was authorized to construct its railway on the bed of the former, and to grade the same, all costs and expenses connected with the change being borne by the railway company.   Under this agreement, the railway company proceded to construct its road, and while grading it at the same angle to which the turnpike company by its charter was required to conform, it so lowered the grade of the road along the line of certain property abutting thereon, as to leave the buildings of the proprietor some feet above the new grade.   On an action brought by the property holder against the railway company to recover damages for the injury alleged to have been sustained by him, it was HELD:

1st.  That the turnpike company acquired by its charter the right to grade, pave and use, in any manner that would promote the benefit and convenience of the public, for the purpose of a public highway, the whole sixty-six feet of roadway, or any part thereof, not less than twenty feet wide, and to grade the same to any *angle less than four degrees,* and that it retained that right up to the time it entered into the agreement with the railway company, and that the holding of the plaintiff was subject to that right of the turnpike company.

2d.  That the turnpike company having the power to change the grade of its road, assigned such power to the railway company, as it was authorized to do by the Act of 1860, ch 34, and the railway company in exercising this power, within the limits prescribed, was not liable to the plaintiff for the injury complained of.

3d.  That the use and occupation of the bed of the turnpike for the purpose of a passenger railway was not a new and distinct servitude, entitling the plaintiff to new compensation for such use of the land, and to damages resulting therefrom,

4th.  That the construction of the railway track upon a portion of the bed of the turnpike, leaving abundant room for the vehicles of travellers who did not use the railway, was not a *new use,* but only a modification of the old one.

5th.  That the railway company had no right in or over the soil beyond that which it acquired from the turnpike company, by permission of the Legislature; and therefore had no right for the acquisition of which the plaintiff could demand from it compensation.

6th.  That the contract between the two companies could not be construed into a provision by the turnpike company, in behalf of abutting land owners, that the railway company should pay them compensation for the exercise of rights, which it derived from the turnpike company, and for which the contract provided payment to the latter.

7th. That the use in the highway defined by the Acts of 1787 and 1801, was that the road bed should be cut down to as near a level, as might be, and by the charter of the turnpike company, that it should be graded down to an angle of at most four degrees; and the fact that it was not so cut down and graded by the turnpike company, could not be construed into an abandonment of the power, defined by the Acts of Assembly and by the charter, to do it at any time.

APPEAL from the Superior Court of Baltimore City.

This was an action of *trespass* brought by the appellant against the appellee, to recover damages for alleged injury to certain leasehold property of the former, in Baltimore county. The facts of the case are sufficiently stated in the opinion of the Court.

*Exception:* The plaintiff at the trial below offered the following prayer:

That the turnpike company had no right to empower the defendant to change the bed of the turnpike road in front of the plaintiff's premises, as the evidence shows was done by the defendant, for its use as a railroad track, except by the agreement of the plaintiff, as he is in law the owner as termor of the bed of the turnpike in front of his premises to the middle of the said turnpike, subject merely to the servitude of such property, for the uses of such turnpike company, according to the grade as it was accepted by the Act of 1809, ch. 2, and that the plaintiff is entitled to recover such damages to his termor interest, as the jury find were the consequences before and at the time of the institution of this suit, of the defendant's conduct in altering the grade of the road to the centre of the turnpike, in front of the plaintiff's premises, and the use of such land for railroad purposes.

The defendant asked the Court to instruct the jury as follows:

1. That in connection with the other Acts of Assembly offered in evidence by the plaintiff, the Legislature had the constitutional power to enact the Act of 1860, chap. 34, also offered in evidence by him, and if the jury shall find that the

agreement of the 11th of March, 1861, offered in evidence by the plaintiff, was made by and between the defendant and the President, Managers and Company of the Baltimore and Fredericktown Turnpike Road; and that under and in pursuance of said agreement, the defendant graded the bed of said turnpike road, and constructed thereon a horse railway, as shown by the evidence, then the plaintiff is not entitled to recover damages from the defendant, for or on account of the said grading of the turnpike and construction of said railway thereon.

2. If the jury find from the evidence that the defendant and the President, Managers and Company of the Baltimore and Fredericktown Turnpike Road made the agreement of the 11th of March, 1861, offered in evidence by the plaintiff, and that under and in pursuance of said agreement, the grading and excavation complained of by the plaintiff, and described in the evidence, were done and made by the defendant on the bed of the said turnpike road, then under said agreement, and the Acts of Assembly offered in evidence by the plaintiff, that is to say, the Acts of 1787, ch. 23; 1790, ch. 32; 1801, ch. 77; 1804, ch. 51; 1809, (June,) ch. 2, and 1860, ch. 34, it was lawful for the defendant to do and make such grading and excavation, and the plaintiff cannot recover damages therefor in this action.

The Court rejected the prayer of the plaintiff and granted the prayers of the defendant. To this action of the Court, the plaintiff excepted, and the verdict and judgment being against him, he appealed.

The cause was argued before BARTOL, C. J., MAULSBY, MILLER and ALVEY, J.

*Charles Marshall* and *Wm. Henry Norris*, for the appellant.

The use of the highway for the purpose of a railway, is a new and distinct servitude, not acquired by the consideration paid for the use of the property as a highway, and such new

use of the land entitles the owner to new compensation, and to damages resulting from such new use. This Court has decided that by the condemnation or purchase of property by a corporation, no right is acquired in the property beyond what is necessary to enable the corporation to accomplish the purpose for which it is allowed to acquire the property. All other rights to the property, not inconsistent with those so acquired by the corporation, remain in the owner. *Kane vs. The Mayor, &c.*, 15 *Md.*, 240.

All the right to this property acquired by the turnpike company, was the right to use the land as a highway. To lay a railway upon an established street or highway, is a new servitude, entitling the property owner to damages, whether the railway company employ steam or horse-power. *Williams vs. N. Y. Central R. R. Co.*, 16 *N. Y.*, 97; *Williams vs. Natural Bridge Plank Road*, 21 *Mo.*, 580; *Nicholson vs. N. Y. & N. H. R. R. Co.*, 22 *Conn.*, 74; *Gardner vs. Boston, &c. R. R.*, 9 *Cush.*, 1; *Tate vs. Ohio & Miss. R. R.*, 7 *Porter*, (*Ind.*,) 479; *Haynes vs. Thomas*, 7 *Porter*, 38; *People vs. Kerr*, 27 *N. Y.*, 188; *Crawford vs. Delavin*, 7 *Ohio N. S.*, 459; *Street Railway Co. vs. Cumminsville*, 14 *Ohio N. S.*, 523; *Douglass vs. Boonsborough Turnpike Co.*, 22 *Md.*, 237, 238; *Ford vs. Chicago & N. W. R. R.*, 14 *Wis.*, 609; *Pomeroy vs. Mil. & Ch. R. R.*, 16 *Wis.*, 640; *Veazey vs. Penobscot R. R.*, 49 *Maine*, 119; *Craig vs. Rochester City and B. R. R. Co.*, 39 *Barb.*, 494.

It is contended by the appellee, that the appellant is not entitled to damages by reason of the change of grade, because the turnpike company, by its charter, was required to establish the same grade, that is an inclination of four degrees with a horizontal line, and the new grade made by the appellee accords with this provision of the charter, and the turnpike company could lawfully authorize the appellee to do what it might have done by its own power.

While the Act incorporating the turnpike company, required its grades to be at an angle of four degrees with a

horizontal line, the charter only authorized the company to acquire such rights of property as might be necessary for its purposes, *by purchase*, and did not give it the power *to condemn* anything except materials. The company took the road as already established by the commissioners of review, with no authority to acquire any new rights of property *except by purchase*. The appellee, therefore, could not acquire from the turnpike company any right to change the grade of the road, without compensation to the land owner.

The change of grade in this case, was *not made by the appellee under any authority of the turnpike company for its own purposes*, but by the authority conferred upon the *appellee by its charter*, subject only to the conditions which the turnpike company was authorized to impose upon the exercise of the power conferred upon the railway company by the Act of 1860, ch. 34.

The question between the parties, therefore, is not whether the Legislature could authorize the railway company to avail itself, with the consent of the turnpike company, of rights which the latter may be supposed to have possessed under its charter, but it is, " could the Legislature confer upon the railway company, a *power distinct from and independent of any power which the turnpike company may have had*, to make alterations in the grade of the turnpike, for the *purposes of the defendant only*, and not required for the purposes of the turnpike company, by which the rights of the plaintiff as between him and the turnpike company, which had been enjoyed more than fifty years, are impaired, and an injury done to his property which, but for the benefit of the defendant, would not have been done, and at the same time, deny compensation to the plaintiff?"

Whatever may be the law as to the power of the Legislature to subject land, already taken as a *highway*, to the additional use of a *railway*, without compensation to the owner for damages arising from such new servitude, it is competent for the Legislature to require the railway company to make

compensation for such new use, and in this case, the Legislature has in fact required the defendant to make such compensation. *Bradley vs. N. Y. & N. H. R. R. Co.*, 21 *Conn.*, 294; *Seneca R. R. vs. Auburn, &c. R. R.*, 5 *Hill*, 170; *Act of* 1860, *ch.* 34, and the contract between the railway and turnpike companies.

While the sixth section of the Act of 1860, ch. 34, permits the defendant to use the highway and to change its grade, it requires as a condition, that it shall enjoy this right, subject to the regulations and conditions imposed by the turnpike company. It makes those regulations in fact a part of the law itself, as much so as if they had been incorporated in its text. Upon examining the regulations, it will be seen that they expressly provide that the railway company *shall pay all damages caused by the change of grade.*

The contract shows clearly that such changes were to be made at the expense, for the use, and upon the responsibility of the railway company alone, and the railway company is as much bound to comply with this regulation to pay damages inflicted by itself, upon property owners, as it is to pay the turnpike company for the use of the road. And if there be a doubt as to the true construction of the charter of the defendants, the public should have the benefit of the doubt. *Taggart vs. W. Md. R. R. Co.*, 24 *Md.*, 588; *Douglass vs. Boonsborough Turnpike Co.*, 22 *Md.*, 238.

*Arthur W. Machen* and *I. Nevett Steele*, for the appellee.

The authority of the turnpike company to make a change of grade is clear. *Acts of* 1787, *ch.* 23, (*April*); 1790, *ch.* 32; 1801, *ch.* 77; 1804, *ch.* 51; 1809, *ch.* 2, (*June*); *Goszler vs. Corporation of Georgetown*, 6 *Wheat.*, 593; *Smith vs. Corporation of Washington*, 20 *How.*, 135; *Callender vs. Marsh*, 1 *Pick.*, 418; *Ely vs. City of Rochester*, 26 *Barb.*, 133; *Plate Glass Co. vs. Meredith*, 4 *T. R.*, 794; *Tyson vs. Commissioners of Baltimore County*, 28 *Md.*, 528.

The change made in this instance was highly beneficial to the turnpike road as such, and was proper and necessary, without reference to the question of the construction of the horse railway upon a portion of the bed of the turnpike. It was expressly sanctioned by the Act of 1860, ch. 34. The alteration of grade being itself proper, and being made at the instance, and under the direction of the turnpike company, the agency or instrumentality employed to effect it, could not make the thing done improper. Both the alteration of grade and the employment of the railway company to make it, were expressly sanctioned and authorized by the Legislature in the Act of 1860, ch. 34.

The construction, upon a portion of the bed of a highway, of a railroad track, to be run upon by cars or carriages drawn by horses—leaving abundant room for the vehicles of travellers who do not use the railroad, is not a *new use*, but only a modification of the old one. The public highway does not thereby cease to be a highway. It is adapted to a new state of things, and made better to subserve the public convenience under the present circumstances, and that is all. *The Commonwealth vs. Temple*, 14 *Gray*, 74; *Elliott vs. Fairhaven & Westville R. R. Co.*, 32 *Conn.*, 579; *District Attorney vs. Lynn & Boston R. R. Co.*, 16 *Gray*, 242; *Douglass vs. Boonsborough Turnpike Co.*, 22 *Md.*, 219.

As a common highway may lawfully be converted into a turnpike road, so a turnpike road may be converted into a common highway, or either into a plank road, or a plank road re-converted into a common public highway. *Douglass vs. Boonsborough Turnpike Co.*, 22 *Md.*, 219; *Wright vs. Carter*, 3 *Dutch.*, *N. J.*, 76; *Pearce vs. Somersworth*, 10 *N. H.*, 369; *Benedict vs. Goit*, 3 *Barb.*, 459; *Heath vs. Barman*, 49 *Barbour*, 496.

A material distinction exists between a railroad to which locomotive steam engines are applied—the safe use of which may necessarily involve an exclusive occupation of the road—and a railway intended only for *horse cars*. Even the use of

steam may be permissible in certain circumstances, and under particular police regulations. *Case of Phila. and Trenton R. R. Co.*, 6 *Whart.*, 25; *Commonwealth vs. Erie & North East R. R. Co.*, 27 *Penn.*, 384; *Murphy vs. City of Chicago*, 29 *Ill.*, 279; *Porter vs. North Missouri R. R. Co.*, 33 *Missouri*, 128; *People vs. Kerr*, 27 *N. Y.*, 18.

MAULSBY, J., delivered the opinion of the Court.

The Act of 1787, chap. 23, passed at the April session, appointed commissioners to examine, survey, lay out and mark a public road from Baltimore town towards Frederick town, sixty-six feet wide, and to cause the same to be *cut down*, and well cleared fifty-two feet wide, and grubbed and stoned forty feet wide, and to agree with the proprietors of lands, through which the same may pass, on the amount of compensation to which they may be entitled for damages, occasioned by the passage of said road through their lands, or in case of inability to agree, then to cause the same to be ascertained by an inquisition; and provided for the erection of gates or turnpikes, and the collection of tolls.

The Act of 1801, ch. 77, recited in its preamble that the said road had been surveyed, laid out, marked and bounded according to the provisions of the Act of 1787, that the same was opened and supported at a very great and expensive charge to the county, and provided new means for managing the same and keeping it in better repair. Amongst other things, it provided by the 4th section, that the supervisor, under the direction of the Levy Court, should cause it to be cleared sixty-six feet wide, and twenty-one feet, at least, bedded with wood, stone, gravel, or any other hard substance. The road was to be made, by the Act of 1787, by straightening and widening the old road, and by making the new, and plats were to be returned to the clerk of Baltimore county, and to the commissioners of Baltimore town.

The Act of 1801, by its 5th section, contemplated that the old road, on the bed of which the location of the new road

ran, was twenty feet wide, and provided for ascertainment of damages to land owners for the additional forty-six feet for the new road, as shewn by the plat then returned and filed, or for the sixty-six feet where the new road had not been located on the bed of the old road, either by agreement with the land owners, or by condemnation. By the Act of 1787, the road was to be, forever afterwards, taken, held and adjudged, in all Courts of Law and Equity, a public road and common highway. By both Acts the jury of inquisition was to take into consideration the convenience and benefit, and the disadvantages occasioned to owners of land by reason of the passage of said road through their lands.

By the Act of 1804, ch. 51, passed 12th of January, 1805, the President, Managers and Company of the Baltimore and Frederick Town Turnpike Road were incorporated, with power to make a turnpike road in, over and upon the bed of the road mentioned in, and provided for, by the Acts of 1787 and 1801. This company was empowered to change the location, when desirable, but that power was not exercised, so far as this case is concerned. Nor is it necessary in this case to refer to other provisions of the charter than the 17th section which provides that twenty feet *at least* shall be bedded with wood, stone, gravel or other hard substance well compacted together, "and so nearly level in its progress as that it shall in no place rise or fall more than will form an angle of four degrees with an horizontal line," and which should be forever, during the continuance of said corporation, maintained and kept in good and perfect order and repair; and to the 19th section, which provides that the company may be authorized to collect tolls, when on having *perfected* the road for distances of ten miles, the Governor shall permit it by license under his hand and the seal of the State; and to the 39th section, which provides that the company shall proceed to carry on the work within two years from the passage of the Act, and complete the same to Frederick town in six years, to Middletown in two years thereafter, and to.

Boonsborough in two years thereafter, or in default, the right of the company to the road not finished, shall revert to the counties respectively. The 3d section of the Supplement of the same year, ch 101, reäffirms, in substance the same forfeiture provided for by the 39th section.

Then follows the Act of June, 1809, ch. 2, which enacts that the said turnpike road from Baltimore to Frederick town, and thence to Middletown, and thence to Boonsborough, as then located, turnpiked and licensed, be and the same is thereby confirmed; and the Act of 1811, ch. 202, reciting in its preamble that it is represented by the petition of the three corporations, created by the Act of 1804, ch. 51, that, since the passage of the Act of 1809, all said companies have completed the whole of said roads, and enacting that all of said roads, as located, turnpiked and licensed, be confirmed.

The questions touching this case arising on a review of these several Acts of Assembly are, what were the powers of the Baltimore and Frederick Town Turnpike Road Company in respect to grading the bed of its road, in part or in whole, prior to the Acts of 1809 and 1811, and how have these powers been affected, if at all, by those Acts? It is clear that whilst the company was obliged to grade twenty feet in width, it was authorized to grade the whole sixty-six feet, if it thought best. To what extent was it authorized to cut down and fill up the road bed, in the process of grading?

The Act of 1787 *required* the commissioners appointed thereby to *cut down* and well clear fifty-two feet of the sixty-six feet of width of the public road and common highway. The extent of cutting down is not specified. The duty was to cut down, as much as was practicable, until the best condition of road attainable was reached, as was useful and beneficial to the road, within limits of reasonable cost. In *Tyson vs. The Commissioners of Baltimore County*, 28 *Md.*, 510, this Court said, " the law casts upon the defendants not only the right, but the duty to protect the public roads from injury,

and keep them in proper repair for the use of the public; individual rights must be held and enjoyed in subordination to those of the public." The commissioners under the Act of 1787 occupied the same relation to the road to be made, and kept in repair, under that Act, as did the county commissioners to the public roads in question in the case in 28 *Md.* Their power to cut down was not confined, we think, to the original making or opening the road. It was a power and duty, always continuing in those having charge of the road, to cut down from time to time, as they might be able, the road bed, until as near a level was attained as might be. The use of the public is promoted, not only by keeping in repair the road as originally opened, but also by reducing its elevations, and filling up its depressions from time to time as may be practicable. In the same case in 28 *Md.*, the Court said that it was the duty of the Commissioners of Baltimore county to adopt the necessary means to prevent the public road in that case from being overflowed by water, and that they would not be justified in the neglect of that duty, merely because the natural flow of water had been allowed for any period to submerge the highway, to the inconvenience and detriment of the public. In that case the plaintiff claimed that inasmuch as the natural flow of the water which supplied his mill, was to overflow the public road, and had done so ever since it had been laid out and used, the commissioners were not justified in erecting a wall to protect the road from the accustomed overflow, the effect of the erection being to damnify his mill. But this Court held otherwise. See also *Goszler vs. Corporation of Georgetown,* 6 *Wheat.,* 593, and *Smith vs. Corporation of Washington,* 20 *How.,* 135.

The commissioners under the Act of 1787, and the other authorities provided by the Act of 1801, had the right, we think, and it was their duty, to cut down the bed of the road, from time to time, to any extent that was useful and beneficial to the road, and promoted the convenience of the public in using it, and this right and duty were transferred to the

Peddicord *vs.* Balt., Catonsville & Ellicott's Mills Pass. R. Co.

President, Managers and Company of the Baltimore and Frederick Town Turnpike Road by the Act of 1804. Their charter obliged them to discharge this duty to the extent that the twenty feet to be stoned, &c., should in no place rise or fall *more* than would form an angle of four degrees with an horizontal line, but did not relieve them from the duty, or perhaps more certainly did not take from them the right, to so construct the road as that the angle should be so much less as the convenience of the public might demand, and as might be accomplished by the use of reasonable means. The company did not comply with this condition of the 17th section of its charter, but constructed the road so that it did rise and fall at a greater angle than four degrees with an horizontal line. The Governor nevertheless issued his license authorizing the collection of tolls. Still the road had not been completed "according to the true intent and meaning of the original Act," in the language of the Supplement of 1804, ch. 101, and remained liable to revert to the respective counties through which it passed, and to relieve it from this liability was, we think, the intent and effect of the Acts of 1809, ch. 2, and 1811, ch. 202. These Acts are nearly or quite identical, and the fact that both were sought for by the company, evidences an apprehension on its part that it was not quite safe from a claim that its property and franchises might be forfeited, until it had obtained an affirmation, and then a reäffirmation, by the Legislature on that point.

The learned counsel of the appellant argued that the Act of 1809, operated as an agreement between the Legislature, the land owner and the company, that the then existing status of the road, in respect to grading, was to be its determinate condition, and that from thenceforth abutting property holders could not be interfered with by any new or changed grade. That thenceforth they were to hold their property exactly as the road then stood, so far as grading was concerned. We are unable to concur in this view. If this were true in respect to the angle of elevation or depression,

why would it not be also true in respect to the embankments on the side of the road, and to the width to which the twenty feet of stoned way might have been cut through elevations. It is presumable that, in its infancy, the company was anxious to collect tolls as soon as possible, and that its efforts were directed to doing first only so much as might be necessary to enable it to reach that result; and therefore that it cut down all elevations only to the width required, leaving on either side large embankments between the cuts and the fences of abutting land owners. Those embankments might be of great value to the land owners in affording them facilities in making and repairing their fences, by giving them access on both sides of their lines of fence. And as they might be gradually removed, in the course of the operations of the company, the removal might be especially hurtful in leaving their posts unsupported, and so throwing down the fences, or necessitating a removal of them within the lines of the land holders. And in many other respects, the construction of the stoned way twenty feet wide only, would leave the remainder of the sixty-six feet convenient and useful to adjoining land owners. If the existing condition of the road in 1809, were by that Act made its determinate condition in respect to grading, it would follow that the same effect must result in all other respects, and if the property holder acquired rights forbidding a change of that condition by a change of the grades by the company, he acquired the same right to demand that the condition should not be altered in any other respect which detracted from his convenience.

Whether the right of way under the Acts of 1787 and 1801, or either, were acquired by purchase, condemnation, or dedication, the result is the same. It was acquired under the Act of 1787 or of 1801. The recital to the Act of 1801 indicates that it had been then acquired. The 11th section of the Act of 1804, shews that it had been before that time acquired. In either case, the purchase, grant or dedication was of the right of way sixty-six feet in width, for any and all the uses

and purposes to which the company was authorized by its charter to apply it, and the adjoining owners of property held *cum onere*, and transmitted their titles *cum onere.* Our conclusion is that the turnpike company acquired, by its charter, the right to grade, pave and use in any manner that would promote the benefit and convenience of the public, for the purpose of a public highway, the whole sixty-six feet of road way, or any part thereof, not less than twenty feet wide, and to grade the same to any angle less than four degrees, and that it retained that right up to the contract entered into between it and the appellee, and that the holding of the appellant was subject to that right by the company.

By the Act of 1860, ch. 34, the appellee was incorporated with power to construct a horse passenger railway, from the city of Baltimore to the village of Ellicott's Mills, and by the 6th section was authorized, provided it could obtain the assent of the Baltimore and Frederick Town Turnpike Company, which consent the latter company was authorized to give, to construct the railway upon the bed of the turnpike road, with power to alter the grade thereof, subject only to such regulations and conditions as might be prescribed by the turnpike company. On the 11th of March, 1861, a contract was entered into between the appellee and the turnpike company, by which, amongst other things, the former was empowered to construct its railway on the bed of the latter, in the centre thereof and with a flat rail, within the city limits, and thence on the southern line of the turnpike, or near thereto, unless where deemed necessary by the superintendent of the latter and the engineer of the former, to the proper construction thereof, it be changed to the northern side, with a T rail. The ordinary travel on the turnpike is not to be interfered with. The railway company is authorized to grade the turnpike bed, and when this is done the whole width of the latter is to be graded, and all costs, charges, expenses and damages connected in any way with the change, are to be borne by the railway company. The railway company did grade the bed

of the turnpike where the property, of which the appellant is lessee, abuts on it, to the same angle to which the turnpike company was required by its charter to grade the same, and from the necessity to do which it was, in effect, by the Acts of 1809 and 1811 released. The consequence was to change the condition of the turnpike bed, as it had existed from the construction of the turnpike to that time, to the inconvenience of enjoyment of the appellant's property. The argument of appellant's counsel was that this change of grade was made in pursuance and by virtue of the power conferred by the Act of 1860, and that it was incompetent to the Legislature to grant the power without providing compensation for the land owner. We do not think that in this case, we are called on to decide whether or not the Legislature may authorize the grade of a highway to be changed, to the injury of abutting property holders, without providing for compensation to them. In this case the power to change the grade was derived, not from the Act of 1860, in our opinion, but from the turnpike company, by virtue of the contract offered in evidence. The turnpike company had the power to change the grade, and it was authorized by the Act of 1860, to assign its power to the railway company. So far as change of grade is concerned, the railway company only did, by permsssion of the turnpike company, that which it was the duty of the latter, under its charter, to do, and that which promoted the convenience of the public in the use of the turnpike as a public highway. The authority given by the contract was not to grade a railway track only, which could not have advantaged the highway for public use, but to grade the whole sixty-six feet, the reduction of the elevation and depression in which must of necessity make it an easier and better highway. Compensation to the land holder for this identical act, that is for grading to as near a level as might be, and which should not exceed an angle of four degrees, had been provided by the Acts of Assembly, in virtue of which the right of way to the road bed had been secured, whether by purchase, grant or

dedication. We do not think that the appellant is entitled to recover, in this case, on account of the grading of which he complains.

It remains to inquire whether the appellant has been injured, and can recover on the ground that the road bed, which was dedicated to the uses of a highway, has been applied to a new use or servitude, as contended by him. It must be borne in mind that the turnpike company had a right to use sixty-six feet, but was compelled only to use twenty feet, for the purpose of a highway, and that of any use which it might make of the sixty-six feet, so only that no part of it was diverted to other uses than of a highway, the appellant had no right to complain. It is not alleged that the turnpike company has appropriated any part of the twenty feet to any other purpose than that of a stoned passage way, according to its charter. Has it devoted any other part of the sixty-six feet to a purpose inconsistent with the objects of its own being, is the question? It has granted to the appellee the right to use part of the sixty-six feet for a passenger railway, in consideration of tolls or rent to be paid. The use so granted does not, in the language of the Court in 14 *Ohio*, 523, "exclude or seriously interfere with the original modes in which the highway was used; but simply adds another, in furtherance of the same general object." The test applied by the Court in that case to the power of the Legislature in the management and control of easements acquired for public highways, is that they cannot be diverted to other purposes than those for which they were acquired, nor enlarged so as to to accumulate additional burdens upon the land, or destroy or impair the incidental rights of the owner, appurtenant to his land located upon the highway; the distinction being between those things which fairly belong to the grant, and those which are reserved to the owner, or by law attach as incidents to his property.

Intending to confine this opinion strictly to the case before us, and, therefore, not to declare whether this test would be

properly applicable in other cases, we accept it in application to this. Can it be said that the grant by the turnpike company, by permission of the Legislature, of so much of the easement of the public highway as may be required to lay a horse railway track on one or the other outside lines of the turnpike's right of way, was such a diversion or enlargement of the easement as operated to impose additional burdens on the land, or to destroy or impair the incidental rights of the owner?

It has been hereinbefore said that the easement of the turnpike company, attached to the public highway by the Acts of 1787 and 1801, before the charter was granted to the turnpike company, included the right to dig down the hills and fill up the valleys to such extent as might be requisite to attain as near a level as might be, and by the charter granted to it, it was made incumbent on the turnpike company so to dig down and fill up as that its road should in no place rise or fall *more* than would form an angle of four degrees with an horizontal line. This being the burden to which the land was subjected by its original appropriation to the purposes of a public highway, and it having been subjected by the railway company, under its license or grant from the turnpike company, to so much only of that burden as was the minimum which it was the duty of the latter company, by its charter, to impose on it, we are unable to see the burden on the land additional to the burden originally imposed by its dedication to the purpose of a highway, or in what manner its value to the owner has been impaired by the construction of the railway track, more than if it had been cut down, graded and covered with stone, or other hard substance, by the turnpike company, or how the passage over it of a car on iron rails, for the conveyance of passengers, could be more injurious to the land and the rights of the owner, than the passage of an omnibus over the stone bed.

It is true, that when the right of way was originally acquired, and when it was granted to the turnpike company, it

was not actually contemplated by any of the parties to the acquisition and grant, that it would be used for a passenger railway, yet it may be said to have been within the legal contemplation of all that it was to be used for all purposes by which the object of its creation, as a public highway, could be promoted. The parties looked to the future—to "forever," if the company should last so long—as well as to the then present, and it cannot be supposed that the authors of its existence intended otherwise than that it should respond to whatever demands, new improvements and increased facilities might make upon it, so only that such demands must be always consistent with its character and purpose as a public highway. The demand made upon it for the use of so much of its sixty-six feet as may not be required for ordinary travel for horses, wagons and carriages, for a horse railway, which will not impede or interfere with the use of all that is required for the ordinary travel actually contemplated by its charter, cannot well be said to be for a new use, in the meaning of the law, but may more properly be said, we think, to be for a new adaptation of its original use to the advancement of public convenience—to a more comfortable and more economical enjoyment of it by the public as a highway.

It was maintained by the appellant that the construction and use of the railway track is an occupation of the soil, permanent and exclusive, and consequently imposed on the land a burden or servitude beyond the mere easement which had been created by the Acts of 1787 and 1801, and granted to the turnpike company by the Act of 1804, and by it assigned to the railway company, and 39 Barbour, 494, and similar cases were referred to. It is not necessary to analyze those cases. They may or may not be law under the facts and circumstances existing in them, and it will be time enough to attempt to reconcile the conflicting authorities, or to determine by which of them this Court will be bound, when the necessity shall arise. The franchise of this appellee to use the road bed of the turnpike company is vested only in, or

resides only in, the public easement of the highway.    The appellee has no estate in the soil beyond that of the public easement of the highway.    Its franchise it derives from the turnpike company by permission of the Legislature.    If. the turnpike company shall be dissolved, or its franchises forfeited in any manner, the turnpike road bed is still to remain a public highway forever, in virtue of the Acts of 1787 and 1801, and the franchise of the railway company will remain attached to, or dependent on, the public easement in the highway.    But that public easement will be within the control of the Legislature, which may direct the public highway to be abandoned and closed ; and with such action by the Legislature the franchise of the appellee, to run its cars on the bed of the highway, would be extinguished.    It has acquired no property or right in, or over, the soil other than the right which it has acquired from the turnpike company, and which it holds, of right, or by legal tenure, dependent on the continuance of the turnpike company as a corporation, and on the obligation of the contract between the two companies.    In other words, it holds under the turnpike company and under the legislative permission to acquire a right under the turnpike company. That being its whole tenure, it possesses no right except the right of the turnpike company assigned to it, and therefore it has no right for the acquisition of which the land owner can demand compensation from it.    If there be a new use to which the turnpike company has appropriated its road bed, such appropriation is the act of that company, and if any could be responsible for it, that company only could be.    The railway company, which has acquired no property, right or estate from the land owner, cannot be liable to him for the value of any. Its franchise rests on, or is vested in, no property or estate of its own, but merely in the public easement in the highway, which easement the public, the Legislature, authorized the turnpike company to permit the appellee to participate in the enjoyment of, for a price to be paid to the turnpike company. The only parties to, or connected with, or concerned in, any

right acquired by the railway company, so far as this case goes, are the turnpike company and the Legislature having control of the public interests, and the only right acquired is the right of the turnpike company, or of the public, as the case may be, and in which the appellant can have no concern except as one of the public.

The proper construction of the contract between the two companies is, that if the railway company shall do any act outside or beyond the rights of the turnpike company which were assigned to it, or for which the turnpike company might be liable in damages, it shall pay the damages for its wrong doing. That contract cannot, we think, be construed into a provision by the turnpike company, in behalf of abutting land owners, that the railway company shall pay them compensation for the exercise of rights which it derived from the turnpike company, and for which the contract provides payment to the latter. We cannot concur, therefore, in the position maintained by the learned counsel for the appellant that a right of the appellant to recover damages was created by the contract between the companies, or that it made any provision for the benefit of the appellant in this case.

The authorities cited by the appellant's counsel go to establish the position that when the public has defined the extent of a use in a highway which it requires, then the rights of adjacent property holders attach to the condition so defined, and it cannot be changed without compensation, on the same principle upon which they were entitled when their property was originally taken for public use. Or, that a change of a defined and established public use is an appropriation to a new use, though it may be of the same nature with the old. This proposition can only apply however when the public has exhausted the right of *user* acquired by it, and not when it has, by one or more acts of *user*, only partially exercised its right, continuing vested with a remainder of the use, to be exercised when, in its judgment, occasion may arise. As in the cases referred to in 6 *Wheaton* and 20 *Howard*, a municipal corpo-

ration, having the power to grade streets, does not exhaust its power by one or more acts of grading, but may continue its acts, and change the grades, so often as the public convenience may demand, and the property holder acquires no right to new compensation for every change of grade. But it is another question when the municipalty, not requiring the change of grade for the public convenience, may grant to a private corporation a right to lay a railway track on its streets, and that corporation may undertake to change the grade for its own advantage, though it may be with the consent of the municipal corporation. In that case it may be well said that the private corporation is seeking to appropriate the use acquired by the public to purposes not within those of its original acquisition, and that the right of the adjacent property holder to compensation for a new use attaches.

Conceding to this position all the force that may be claimed for it, it does not, we think, apply in this case. Here the use defined by the Acts of 1787 and 1801, was that the road bed should be *cut down,* according to our construction, to as near a level as might be, and by the charter of the turnpike company, that it should be graded down to an angle of, *at most,* four degrees; and the fact that it had not been cut down to as near a level as might be, and that it had not been graded by the turnpike company *so nearly* level, as that it did rise and fall more than formed an angle of four degrees with an horizontal line, cannot be construed into an abandonment of the powers defined by the Acts of Assembly and by the charter, to do it at any time.

We trust that nothing can be found in this opinion which may tend to hinder an efficient discharge of the duty of this Court, in whatever cases may arise, involving the protection of private rights against that class of encroachments which were alluded to in the closing argument of the appellant's counsel with force and eloquence.

*Judgment affirmed.*

(Decided 20th June, 1871.)