JAMES E. GREEN *vs.* THE CITY AND SUBURBAN RAILWAY COMPANY, and THE BALTIMORE AND YORKTOWN TURNPIKE ROAD.

*Turnpikes—Conversion of Part of Turnpike into an Electric railway—Change of Grade—Right of Abutting property Owners to Compensation—Injunction—New servitude.*

By section 17 of ch. 51 of the Act of 1804, incorporating certain turnpike companies, said companies were required to keep the roads open to the same width as they were originally laid out and confirmed by the commissioners of review and Acts of Assembly previously passed, and to make artificial roads at least twenty feet in width * * * "and so nearly level in its progress as that it shall in no place rise or fall more than will form an angle of four degrees with an horizontal line," &c. This Act and a previous Act of 1787, ch. 23, provided for compensation to the property owners for such damages as they sustained by reason of the roads passing through their lands. The B. and Y. Turnpike Company which was one of the companies so incorporated, never complied with the requirement of its charter in regard to the grade of its road. A bill was filed by the owner of land abutting on the westernmost side of said road, against said turnpike company, and the City and Suburban Railway Company, alleging that although the grade of the road had been established for sixty or more years, the defendants were engaged in constructing a new roadway on the easterly side of the turnpike road, which was to be used as a

Green *vs.* City and Suburban Railway Co.

railway upon which cars were to be propelled by electricity; that an embankment or fill had been made in front of the plaintiff's lot on the easterly side of said road which they proposed to extend to the westerly side of said road, by means of which the value of the plaintiff's property would be greatly diminished; that a judgment at law against the railway company would be of no avail by reason of a mortgage against its property; and that no steps had been taken by the defendants to make compensation to the plaintiff. The bill prayed for an injunction, and pecuniary damages, and for general relief. HELD:

1st. That the intent and effect of the Acts of 1809, ch. 2, and 1811, ch. 202, which virtually admitted that the turnpike company had complied with its charter, was to relieve the company from the liability of having its property revert to the county, and did not operate as an agreement between the Legislature, the land owners, and the company that the then existing *status* of the road, in respect to grading, was to be its determinate condition, and that from thenceforth abutting property holders could not be interfered with by any new or changed grade.

2nd. That the fact of the grade in front of the plaintiff's property having been established (as it existed before the work referred to in these proceedings was commenced) gave him no right to claim that it could not now be changed, and did not estop the turnpike company from asserting its rights to change it, notwithstanding the requirements in its charter.

3rd. That as the turnpike company had the right to change the grade of its road in front of the plaintiff's property, he was not entitled to compensation for any injuries to his property caused by such change in the grade.

By the Act of 1860, ch. 259, the turnpike company was authorized to lay a railway track on the road between Towson and Baltimore, and by the Act of 1872, ch. 337, it was authorized to grant unto another company the railway privileges, franchises, &c., which it held. By the Act of 1890, ch. 225, it was authorized to use for the propulsion of cars on its railway tracks "any motive power or system of traction whatever," and to lay down an additional railway track upon the bed of the turnpike road where only a single track existed, "provided, that no motive power or system of traction other than horses shall be made use of by the said corporation within the limits of the City of Baltimore, without the consent of the Mayor and City Council of

Green *vs.* City and Suburban Railway Co.

Baltimore." In June, 1892, the turnpike company granted its railway privileges to a railway company which transferred them to its co-defendant the City and Suburban Railway Company. HELD:

1st. That the authority given to the turnpike company, and afterwards transferred to its co-defendant, to use "any motive power or system of traction" included the use of electricity.

2nd. That this legislative grant so far legalized the use and occupation of part of said road for an electric railway, as to protect the company from punishment for the maintenance of what might otherwise be a public nuisance.

3rd. That the rights of the plaintiff were not so affected by the acts complained of as to entitle him to the restraining power of a Court of equity to prevent the electric railway from being built or used.

4th. That the use of electricity as a motive power upon a road already set apart for public travel, did not impose a new servitude upon the road so as to entitle abutting lot owners to additional compensation for injuries resulting from such use, unless they were caused by a negligent construction or maintenance of the road.

APPEAL from the Circuit Court for Baltimore County, in Equity.

This appeal was taken from an order of the lower Court, (FOWLER, J.,) dismissing the bill of complaint, and dissolving the temporary injunction previously granted. The case is stated in the opinion of this Court.

The cause was argued before ROBINSON, C. J., BRYAN, PAGE, McSHERRY, and BOYD, J.

*Z. Howard Isaac, William S. Keech,* and *William Pinkney Whyte,* for the appellant.

*E. J. D. Cross,* and *John K. Cowen,* for the appellees.

Green *vs.* City and Suburban Railway Co.

Boyd, J., delivered the opinion of the Court.

The bill was filed in this case by the appellant against the appellees, and prays for an injunction to restrain the defendants, and each of them, from making or causing to be made any embankment or fill on the Baltimore and Yorktown Turnpike Road in front of appellant's property; also for pecuniary damages and for general relief.

It alleges in substance that appellant is the owner of a lot which fronts and abuts fifty feet on the turnpike road, and is improved by a dwelling-house occupied by appellant; that the only access to said house and lot is from the said turnpike road; that although the grade of the road had been established for sixty or more years, the appellees had been for some months past engaged in constructing a new roadway on the easterly side of the turnpike road, which was to be used as a railway, upon which cars are to be propelled by electricity; that in thus constructing the said roadway or railway cuts of ten feet and upwards had been made in some places, and in other places embankments or fills of ten feet and upwards had been made; that one of the said fills had been made on the easterly side of said turnpike road in front of appellant's lot, of about six feet above the bed of the turnpike; that the appellees were about to extend said fill to the westerly side of the turnpike along and up to appellant's premises, by means of which he will be deprived of or seriously hindered in his right of access to his property from the turnpike, and the value of his property greatly diminished and almost entirely destroyed, &c.

It further alleges that improvements were made by persons owning property abutting on the turnpike road on the belief that the grades, which had been established for sixty years or longer, could not be rightfully changed to the injury of such persons—thus depriving

them of access to and egress from their property. It is also alleged that a judgment at law against the railway company would be of no avail by reason of a mortgage against its property, and that no action has been taken by the appellees to make compensation to appellant for the injury done and about to be done, if permitted, to his property. The charge is then made that it will be in violation of sec. 40 of the 3rd Article of the Constitution of Maryland to permit the appellees to proceed without first making just compensation, as it will be such a *taking* of the private property of the appellant as is forbidden by the Constitution, except upon payment of just compensation first being made.

The defendant companies filed separate answers, each of which denies that the railway company was grading the road, but admits that the turnpike company was, and claims that it was authorized to do so by its charter and the amendments thereto. They claim that the turnpike company has the right to change the grades in the road as may be necessary, and that the estate of the plaintiff in his property abutting upon the said road is always subject to the right of the said turnpike company to alter its grades as public convenience should require from time to time. Various Acts of the General Assembly are cited in the answers, and the decision of this Court in the case of *Peddicord vs. Balto., Catonsville and Ellicotts' Mills Pass. R. Co.*, 34 *Md.*, 463, is relied on as establishing the right of the turnpike company under its charter to make the changes complained of. They admit that the railway company proposes to use electricity as a motive power on its road. They deny that appellant has any interest or property in the premises which should be acquired by process of eminent domain.

The evidence differs somewhat as to the height of the proposed fill in front of appellant's lot—that of plaintiff

showing that it will be from about six feet at the highest point to a little over four feet at the lowest above the former level of the road, whilst that of defendants shows that it will be over four feet at the highest point and less than three feet at the lowest point. There is the usual contrariety of opinions of witnesses as to the effect of the contemplated changes on the value of the property.

The Court below dissolved the temporary injunction previously granted, being of the opinion that *Peddicord's Case* was conclusive of this one.

The damage specially complained of by appellant is the alleged *interference with the ingress and egress to and from* his property *by the proposed change of the grade of the turnpike road*, which had been established for sixty or more years. This he claims constitutes a "taking of private property" within the meaning of Article 3, sec. 40, of the Constitution, which forbids private property from being taken for public uses without compensation being first made or tendered. So far as there will be any interference with appellant's access to the road, it will be caused by the change of the grade and not by the electric railway, and, although it may be true that there would have been no change in the grade of the turnpike if an electric road was not contemplated, the first point that suggests itself for our consideration is whether the change in the grade can lawfully be made for any purpose under the circumstances of this case. If we answer this question in the affirmative, we must then determine whether the fact that the defendants, or either of them, propose, as they admit, to build or construct an electric railway on this *changed grade* will justify a Court of equity in giving the relief sought in this case.

The Act of 1804, ch. 51, which incorporated the defendant turnpike company, also incorporated the Balti-

more and Frederick Turnpike Road and the Baltimore and Reisterstown Turnpike Road—imposing the same duties and vesting the same powers in each.

The Court, in *Peddicord's Case,* which involved the rights and powers of the Baltimore and Frederick Turnpike Road, referred at length to the various Acts of Assembly which affected those three companies, and hence it will not be necessary to quote as fully from them as we might otherwise do, but we will briefly refer to such portions of them as may be applicable.

The Act of 1787, ch. 23, was the earliest legislation in this State in regard to turnpikes. That Act provided that the roads should be cleared fifty-two feet in width, grubbed and stoned forty feet, and also provided for ditches, when necessary, of six feet in breadth.

The Act of 1801, ch. 77, provided that the roads should be cleared for the width of sixty-six feet, and that twenty-one feet thereof should be turnpike road.

Under those Acts, the roads were in charge of public officers, and as they had failed to meet the demand for good roads, the Act of 1804, ch. 51, was passed, and the companies thus organized were authorized to make their turnpikes on the roads already existing, which they did. The 17th section of that Act required the companies to keep the roads open to the same width as they were originally laid out and confirmed by the Commissioners of Review, and Acts of Assembly previously passed, and to make artificial roads, at least twenty feet in width, of some hard substance, so as to secure a firm and, as near as the materials would reasonably admit, an even surface, " *and so nearly level in its progress as that it shall in no place rise or fall more than will form an angle of four degrees with an horizontal line,*" &c.

The Acts of 1787 and 1801 provided for compensation to the property owners for such damages as they sustained by reason of the roads passing through their

lands. The lands occupied by this company were presumably paid for as provided for by the said Acts, and by the Act of 1804 the company was required to pay Baltimore County for the money expended by it.

The deed of the plaintiff does not attempt to convey to him any interest in the land occupied by the road, but, on the contrary, limits his lines to the westerly boundary of the road.

It is not pretended that the turnpike company had ever complied with the requirement of its charter to build the road "so nearly level in its progress as that it shall in no place rise or fall more than will form an angle of four degrees with an horizontal line," &c., but it is claimed for the appellant that the turnpike company cannot now change the grade—especially after the acceptance of the Acts of 1809, ch. 2, and 1811, ch. 202, which virtually admitted that the company had complied with its charter. The intent and effect of these Acts, however, as was said in *Peddicord's Case*, were to relieve the companies from the liability of having their property revert to the counties, and they did not operate as an agreement between the Legislature, the land owners and the company, that the then existing *status* of the road in respect to grading was to be its determinate condition, and that from thenceforth abutting property holders could not be interfered with by any new or changed grade. No Act of the General Assembly has been passed which took away the *right* of the company to conform to the grade contemplated by its charter, even if those above cited have relieved it from the *requirement* of doing so. It can hardly be contended that, because the Legislature relieves a company from a penalty, or forfeiture of certain rights, incurred by reason of its failure to comply with the requirements of its charter, it can never thereafter comply with them. Nor is it sound reasoning to say that, inasmuch as this com-

pany had been violating its charter for sixty or eighty years, it should be forever thereafter required to violate it. We cannot adopt appellant's position that, because the grade in front of his property had been established (as it existed before the work referred to in these proceedings was commenced) for sixty or more years, therefore it cannot now be changed, and that the turnpike company is estopped from asserting its right to change it, notwithstanding the requirements in its charter.

In *Goszler vs. Corporation of Georgetown*, 6 *Wheat.*, 593, an ordinance had been passed by which it was ordained "that the said level and graduation when signed by the said commissioners, or a majority of them, and returned to the clerk of this corporation, shall be forever thereafter considered as the true graduation of the streets so graduated, and be binding upon this corporation and all other persons whatever, and be forever thereafter regarded in making improvements upon said street." The plaintiff made his improvements according to the graduations made and returned to the clerk. Subsequently the corporation proceeded to change the grade and to cut down the street by the plaintiff's house. The plaintiff was refused relief by the Court below and the Supreme Court of the United States, through Chief Justice MARSHALL, affirmed the decision on the ground that the power to grade the streets of the city was a continuing power, and that the corporation could alter the grade from time to time. The Court said, "it cannot be disguised that a promise is held forth to all who should build on the graduated streets, that the graduation should be unalterable;" but it held that the corporation could not abridge its power of changing the grades of its streets which the Legislature had given it the power to do.

In this case, the appellant by an examination of the charter of the turnpike company and the amendments

thereto, could have ascertained not only that there was
nothing in them to prevent a change of the grade, but
that the charter required a different grade from the one
in use when he purchased his property. Circumstances
might, as in fact they did, arise, which would make it
desirable for the company and the public to have their
road as nearly level us possible, and no valid reason has
been assigned why it should not be permitted to improve
the grade of its road.

But we think the case of *Peddicord vs. Balto., Catons-
ville and Ellicotts' Mills Passenger Railway Co.*, 34 *Md.*,
463, already cited, is conclusive of this question. That
case determined the rights of the Baltimore and Fred-
erick Turnpike Road, which, as stated above, was char-
tered by the same Act as the Baltimore and Yorktown
Turnpike Road. In that case the road-bed was cut
down at the point complained of, whilst in this it was
filled; but of course there could be no difference, so far
as the rights of the abutting land owners are concerned.

This Court said on page 474, that "the commissioners
under the Act of 1787, and the other authorities pro-
vided by the Act of 1801, had the right, we think, and
it was their duty, to cut down the bed of the road from
time to time to any extent that was useful and bene-
ficial to the road, and promoted the convenience of the
public in using it, and this right and duty were trans-
ferred to the President, Managers and Company of the
Baltimore and Frederick Turnpike Road, by the Act of
1804." Again, it is said, on page 477: "Our conclusion
is that the turnpike company acquired by its charter
the right to grade, pave and use in any manner that
would promote the benefit and convenience of the pub-
lic, for the purpose of a public highway, the whole
sixty-six feet of roadway, or any part thereof, nor less than
twenty feet wide, and to grade the same to any angle
less than four degrees, and that it retained that right

up to the contract entered into between it and the appellee, and that the holding of the appellant was subject to that right by the company."

Being of the opinion that the turnpike company has the right to change the grade of its road in front of appellant's property, it follows from what we have said that he is not entitled to compensation for any injuries to his property caused by such change in the grade. As was said by Justice GRIER in *Smith vs. Corporation of Washington*, 20. *How.*, 135: "The plaintiff may have suffered inconvenience and been put to expense in consequence of such action, yet as the act of defendants is not 'unlawful or wrongful,' they are not bound to make any recompense. It is what the law styles '*damnum absque injuria.*' Private interests must yield to public accommodation, &c."

It is contended, however, that the appellee cannot build an electric railway on the road without compensating the property owner for this "additional servitude," as it is alleged to be.

The proof in the case is that the turnpike company was doing the grading, which is the act specifically complained of in the bill, and which we have determined it had the right to do. The tracks of the railway company occupy about one-third of the right of way of the road. They are to be laid on the easterly side of the turnpike road. There will be considerably more space outside of the railway tracks than the charter requires to be macadamized. The grade will be more desirable for the travelling public, and the property owners on the road will have the benefit of rapid transit. By the Act of 1860, ch. 259, the turnpike company was authorized to lay a railway track on the road between Towson and Baltimore, and by the Act of 1872, ch. 337, it was authorized to grant unto another company the railway privileges, franchises, &c., which it held. By the Act

of 1890, ch. 225, it was authorized to use for the propulsion of cars on its railway tracks *"any motive power* or *system of traction whatever,"* and to lay down an additional railway track upon the bed of the turnpike road where only a single track existed, provided that no motive power or system of traction other than horses shall be made use of by the said corporation within the limits of the City of Baltimore without the consent of the Mayor and Council of Baltimore.

On June 1st, 1892, the turnpike company granted its railway privileges to the Baltimore Union Passenger Railway Company, and the City and Suburban Railway Company became the successor to those rights. We find then that the defendant railway company has obtained the rights and privileges of the turnpike company, which had received express authority from the Legislature to build railway tracks on its road, and to use *"any motive power* or *system of traction"* for the propulsion of cars. That authority certainly includes the use of electricity, especially as it was granted in 1890, at a time when that motive power for cars was very generally used.

It would seem to be perfectly clear then that this legislative grant so far legalized the use and occupation of part of this road for an electric railway as to protect the company from punishment for the maintenance of what might otherwise be a public nuisance. It only remains to determine whether the rights of the appellant will be so specially affected as to entitle him to the restraining power of a Court of equity to prevent the electric railway from being built or used under the circumstances of this case. As we have already seen, the appellant has no interest in the land occupied by the turnpike company, and hence is not entitled to compensation as an owner of the reversionary interest therein. If he is entitled to the interference of a Court

of equity at all it must be by reason of some special injury he, as an owner of abutting property, has or will sustain, which will amount to a taking of his property within the meaning of the constitutional provision above referred to. He is not entitled to protection against mere consequential damages which he suffers in common with others; and we have already said, he is not entitled to compensation for the interference of the ingress and egress to and from his lot on account of the change of the grade, as we have determined that the turnpike company had the right to make such changes. It is doubtless true, that neither the Legislature of 1787, nor the property owners from whom the lands on which the road is built were obtained, contemplated the building of a railway on this road—especially one on which cars were to be moved by the use of electricity, but it is equally true that the law would not require this to be continued as "a dirt road" simply because it was originally constructed in that way. This road well illustrates the progress that has been made within the past century. At first it was a poorly constructed dirt road, then it became a turnpike, then part of its right of way was occupied by a horse car railway, which, in its turn, must now give way to an improved method of travel on public highways.

To quote from *Peddicord's Case,* on page 481: "It may be said to have been within the legal contemplation of all, that it was to be used for all purposes by which the object of its creation, as a public highway, could be promoted."

In that case it was expressly decided that the building of a horse car railway on the Baltimore and Frederick Town Turnpike was not a new servitude. This Court has also determined in *Hodges, and others vs. The Baltimore Union Passenger Railway Company, and others,* 58 *Md.,* 603, that the use of the streets of a city or town

for the purpose of a horse railway is not an additional servitude for which adjoining lot owners are entitled to compensation, and in *Hiss and Wife vs. Baltimore and Hampden Passenger Railway Company, et al.,* 52 *Md.,* 242, the same doctrine was applied to a road or street just outside of the corporate limits of the City of Baltimore. In fact, this may be accepted as the established law of this country with very few exceptions. Many of the cases on the subject are collected in the note to sec. 82 in *Booth on Law of Street Railways.* Some of those authorities have distinguished between horse car railways in the streets of cities and towns, and those on the country roads; but if we were inclined to adopt the distinction at all, we would not under the circumstances of this case—especially as the question is settled in a case so similar to this as that of *Peddicord, supra.*

As the use of electricity as a motive power is comparatively new, there has not been as many decisions concerning electric railways as horse car railways; but we are not without authorities on the question whether they constitute new servitudes which entitle abutting owners to compensation. Those from other States might be cited, but the recent case of *Koch, et al. vs. North Avenue Railway Co.,* 75 *Md.,* 222, decided that a street is a way set apart for public travel, and the use of electricity for propelling street cars is but a new and improved motive power in no manner inconsistent with the uses and purposes for which streets were opened and dedicated as ways for public travel, that the Mayor and City Council of Baltimore had the power to authorize this use of electricity, and that the use does not impose a new servitude upon the streets so as to entitle abutting lot owners to additional compensation.

Of course the railway company may make itself liable to the appellant by a negligent construction or maintenance of the road. Those using electricity as a motive

power on public highways, such as the turnpike referred to in this case, must remember that they have not the exclusive right to the highway, and must respect the rights of others equally entitled to use it. If they do not, of course the law will require them to do so. It will be incumbent on the turnpike company to keep the road in proper condition for vehicles other than street cars, and of the width required by its charter.

The railway company must so construct its tracks and run its cars as not unnecessarily or improperly to interfere with the rights of others in the use of this public highway. If either company fails to discharge its duties to the public the proper tribunal will give relief to those injured; but we cannot anticipate defaults or acts of negligence on the part of the defendant companies, or either of them, and must dispose of this case as it is now presented to us. We think it clear that under the evidence and the authorities, especially *Peddicord's Case*, which we have no desire to disturb or modify, the appellant is not entitled to the relief asked for in this case, and the decree of the Court below must be affirmed.

*Decree affirmed, with*
*costs to the appellees.*

(Decided 11th January, 1894.)