MARY WENSEL, Administratrix, Appellee, v. CHICAGO, MIL-
WAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

**RAILROADS:** Self-Preservation and Reliance on Signals. The pre-
1   sumption that a person will act in harmony with the recog-
nized instinct of self-preservation, aided by the legal right of
deceased to rely on the giving of warning signals by an engine
crew in approaching a public crossing, at great speed, on a
dark night, may create a jury question on the issue of deceased's
negligence in entering upon such crossing, even though, under
other conditions of light at the same place, the deceased might
have had an unobstructed and safe view of an approaching
train for a distance varying from 260 feet to one-half mile.

**DEDICATION:** Conclusive Intent. Intent on the part of an owner
2   of land to dedicate the same for a public highway will not be
*conclusively* presumed on a record showing:
    1. That, for at least 20 years, the public had continuously
and generally used, as a public highway, a well-defined railway
grade, which had been abandoned for switching purposes.
    2. That, during said time, the public authorities improved
said way as a public highway.
    3. That, until about the end of said time, the railway com-
pany maintained a crossing where said abandoned grade
touched its main line, but then removed said crossing, owing
to the fencing of said way by the presumed owner thereof.

**HIGHWAYS:** Dedication by Conduct. Conduct on the part of an
owner of land, when relied on to show a *conclusive* intent to
dedicate the land for highway purposes, must be unequivocal.
So held where the record showed travel and public improve-
ment for many years, but revealed uncertainty (a) as to the
ownership of the land during part of the time, and (b) as to
the extent and nature of the original right in the land.

**RAILROADS:** Estoppel to Dispute Public Nature of Crossing. A
railway may not be estopped from insisting that, at the time
of an accident, a crossing was not public, when it had removed
said crossing and ceased the maintenance of the same long prior
to the accident in question.

*Appeal from Marshall District Court.*—James W. Willett,
Judge.

January 20, 1919.

Rehearing Denied March 12, 1919.

Action for damages resulted in the judgment against
defendant from which it appeals.—*Reversed.*

*Hughes, Sutherland & O'Brien* and *E. N. Farber*, for
appellant.

*Carney & Carney,* for appellee.

Ladd, C. J.—The railway track of the Chicago, Milwau-
kee & St. Paul Railroad Company extends through the in-
corporated town of Melbourne in an easterly and westerly
direction, and that of the Chicago Great
Western Railroad Company passes over it
at right angles, on an overhead crossing.
Two hundred and fifty-one feet east of the
intersection is an overhead crossing of the highway. Two
hundred and sixty-three feet west of the railway intersec-
tion, an alleged highway crosses the Chicago, Milwaukee &
St. Paul Railroad Company's right of way and tracks. At
about fifteen minutes after six o'clock in the afternoon of

1. RAILROADS : self-
preservation and
reliance on
signals.

January 21, 1914, George O. Wensel, when about to walk from the north along this alleged highway over the tracks, was struck by a western bound passenger train, and killed. The petition charges defendant with negligence in several respects:

(a) In not having a headlight upon the front end of the engine, of sufficient power to be seen at a reasonable distance, considering the speed of the train; and, in fact, having no light at all, sufficient for headlight purposes.

(b) In approaching the crossing referred to, one which had been used for years by pedestrians and teams, with the full knowledge of the defendants, without sound of whistle at a sufficient distance east of the crossing to give notice to anyone attempting to cross, that a train was approaching.

(c) In not causing or having the bell upon said engine rung as an alarm, at a sufficient distance east of the said crossing so that persons attempting to cross should hear it and protect themselves from danger.

(d) In operating the said train and engine at a dangerous and excessive speed, exceeding 50 miles an hour at the time, on the evening in question, into and through the limits of the incorporated town of Melbourne, aforesaid, when pedestrians or teams, it might be anticipated, would be attempting to cross the railway at the crossing in question.

(e) That defendant, well knowing the fact that the crossing in question, being within the limits of the incorporated town of Melbourne, was used very frequently by teams' and pedestrians, well knowing the danger of high speed with no headlight or sound of whistle or bell, and at excessive speed, on the occasion in question, negligently and recklessly operated its engine and train in such manner as to instantly kill George O. Wensel, and all by reason of the carelessness and negligence of the defendants, as aforesaid.

(f) That the defendant, contrary to the provisions of

the ordinance set forth, did operate the said locomotive engine and train, on the occasion in question, negligently, within said town, and prior to striking the said George O. Wensel, without ringing the bell of the locomotive continually, as provided in said ordinance.

These charges of negligence were put in issue, as was plaintiff's averment that decedent was without fault.

I.   Appellant's first contention is that the evidence conclusively shows that Wensel was guilty of contributory negligence.

After completing the work of the day on the farm, decedent, accompanied by Nelson, walked along the Chicago Great Western Railway Company's track to the bridge or overhead crossing, passed down the grade, and took a well-beaten and traveled path about 30 feet north of the Chicago, Milwaukee & St. Paul Railway tracks, and proceeded along the same in westerly direction to the center of the alleged road, 36 feet north of the north rail of said track, and turned south.   Wensel walked ahead; and, as he stepped close to the track, he was struck by the pilot beam of the engine, and his body thrown 50 feet.   The dotted line on the annexed map shows the course they pursued.

The jury might have found from the evidence that, as the train approached from the east, the whistle was not blown, the bell was not rung, and that the train was moving at a speed of from 40 to 50 miles per hour.

Nelson testified that, when walking along the path, and at "2" in the dotted line, about 84 feet west of where they turned to go over the track, he stepped down about 6 feet to the south, and looked for trains, but saw none; that he could see the piling of the Chicago Great Western Railway Company's overhead crossing, but could not see the overhead wagon bridge beyond; that the place where he stopped was 8 or 10 feet above the double track, and from there he followed Wensel in a westerly direction, as

recited, until 5 or 6 feet behind him when reaching the track; that he did not notice Wensel looking; that he (witness) was watching the footpath or wagon road; that there was an embankment toward the east, and, owing to the darkness, he could not see the railroad bridge,—merely an outline of it,—could not see it plainly.

"Just a few seconds before he (Wensel) got killed,— it was not very many seconds,—I saw a little bit of a light coming. It looked like a switch light, off 300 yards. There was no other light on the train."

He testified further that he was then 5 or 6 feet back of Wensel, and:

"It was a very few seconds after I saw the engine before he was struck. The engine was about 30 feet away. * * * There wasn't a particle of light. There was no bell rung or whistle sounded. * * * There wasn't any sound indicating the approach of a train. * * * It didn't take very many seconds from the time I saw the train until it hit him,—took him out of my hands. I pretty near held him; I tried to clutch him, but couldn't,—it was so quick. It was going so fast that you wouldn't have time to think of what you would do."

With reference to observing Wensel, the witness testified he had not looked at Wensel, to determine whether he was looking or not.

"Q. And that is the reason that you didn't notice him look? A. No, sir. Q. So far as your personal observation of Mr. Wensel's head just prior to the injury or striking, you don't know whether he looked east or west? A. No, sir; I didn't notice his head. Q. On coming down that path from the corner, can you say whether or not you noticed Mr. Wensel's head,—in what direction it was turned? A. No, sir."

Re-cross-examination:

"Q. There was an incandescent light in front then? A. There was no light to speak of. There was a light,—yes; but it showed no reflection on the ground, anyway; it showed no reflection of the light whatever. Q. There was a light there? A. Yes, sir. Q. And you saw it? A. Just for a second. Q. By looking, you could see the light, couldn't you? A. Yes, sir; that is all you could see. I saw the light and knew it was a light and knew there was a train coming, and as near as I could guess, it was 30 feet away at that time. I believe it was that distance away. * * * Q. And you didn't see him look then? A. No, sir. Q. And

yet you were looking at him? A. Possibly,—yes; I was looking at him, of course, trying to get hold of him."

Re-direct examination:

"Q. Did you look at him until you tried to get hold of him? A. No, I didn't look at him before till I seen the light, and then I made a break for him. There was no gleam of light on the rails or track ahead of the engine."

He had made a written statement, previous to the trial, that Wensel was in plain view; that he did not see him look to the east, and did not think he looked in the direction from which the train was coming.

One Bollenbacker, assisted by others, made experiments as to how far east they could see from certain points north of the track at the crossing in question. At a point about 20 feet north of the north track, they testified to having a clear view, looking east, for 500 feet, without obstruction; at a point 32 feet north of the north rail, to having a clear view for 262 feet up to the Chicago Great Western Company's overhead bridge; that, from the center of this crossing to the west end of the embankment north of the Chicago, Milwaukee & St. Paul Railway Company's track, the distance was 62 feet; that it was 26 feet from the top of the embankment at the west end to the most northerly rail, and at the bottom, a distance of 20 feet; that, from a point 14 feet north of the northerly rail in the crossing, they could see past the overhead wagon bridge; that, from a point 5½ feet north of the north rail at the crossing, they had an unobstructed view to the curve, approximately one-half mile away.

It is evident from this that looking from the point marked "2" 36 feet north and 84 feet east of the crossing, ought not, under the circumstances, to be regarded as the exercise of the degree of care exacted before undertaking to pass over the crossing. Nelson does not appear to have looked again before reaching a point 5 or 6 feet north

of the north rail, but this was in time to enable him to avoid danger. The jury might have found that he did not observe whether Wensel looked or turned his head in either direction; and if they so did, an inference arose that, owing to the natural instinct of self-preservation, he was in the exercise of ordinary care in approaching the crossing, and such inference was to be considered in connection with all the evidence adduced, in passing on the issue as to whether decedent was guilty of contributory negligence. *Phinney v. Illinois Cent. R. Co.*, 122 Iowa 488, 492; *Lunde v. Cudahy Packing Co.*, 139 Iowa 688; *Gray v. Chicago, R. I. & P. R. Co.*, 143 Iowa 268. Had he looked at the point in the alleged road in turning south, he could not have seen beyond the overhead railroad crossing, and the train had not then reached that point. As appears from the experiments, the view became more extended as he approached the track. The east boundary of Melbourne was the highway passing over the highway overhead crossing. No stop was made in the town, and it might have been found that the speed of the train was at least 45 miles per hour, without any warning, such as sounding the whistle or ringing the bell, without headlight other than one likened unto a switch light 300 feet away, and scarcely visible, and that the "roar of the train" was unheard in front, as it approached the crossing; and if so, and something of care might be inferred, there was room for the jury to find that decedent was without fault in what he did. Of course, if he must have seen the approach of the train, had he done what his instincts for self-preservation exacted, nothing could be gained by indulging in the presumption that he so did. Nor can it be said, in view of his right to rely on the giving of statutory signals, that, if none were given, and the roar of the train could not be heard, failure to listen necessarily constituted negligence. It is well settled that decedent was not bound to look and listen from any particular point in

the way, if, in keeping a lookout, he exercised ordinary care.
All required of decedent was that he exercise ordinary care
for his own safety, in approaching the tracks; and the evi-
dence, as we think, was such as to carry that issue to the
jury.

II.    The court instructed the jury that the point where
Wensel was killed was on a highway crossing, and the al-
leged road along which he was approaching it was a pub-
lic highway, and so shown to be by the un-
disputed evidence.   The situation will be
better understood from an examination of
the annexed map.

2. DEDICATION:
conclusive in-
tent.

The evidence showed that there was a well-worn path-
way from A on the map, the entire length of the dotted line;
and that, for many years, children, in going to and return-
ing from school, and people generally, made use of it.   This
had continued many years.   The evidence was equally con-
clusive that, about 25 or 30 years prior to the accident, a
railroad track connected the Chicago Great Western Rail-
road and the Chicago, Milwaukee & St. Paul Railroad, ex-
tending from A to B on the map, for switching purposes;
and that, about 25 or 30 years ago, this track was removed,
and the switching thereafter done south of the latter com-
pany's track; and that thereafter, and for 20 or 25 years, the
wye from A to B, and from the latter point on south over
the crossing to the business portion of Melbourne, was trav-
eled by the public generally as a highway, being made use
of by the inhabitants generally, living east and northeast
of Melbourne; that the road was improved by the incor-
porated town of Melbourne by inserting a wooden culvert,
a few years prior to the trial, and making some repairs
thereon; that, throughout this period, the Chicago, Milwau-
kee & St. Paul Railroad Company maintained a crossing of
plank and dirt over its tracks continuously up to Decem-
ber, 1912, or in July following, when the fence indicated on

the map was constructed by one Miller, and the company lowered a portion of its tracks and removed all or a portion of the planks from the crossing. Shortly afterwards, Miller constructed a gate, as appears on the map, and he and some neighbors persisted in the use of this crossing; and, shortly after this accident, the company restored the crossing of plank and dirt. After the construction of the fence, the traffic seems to have passed south over the wagon crossing.

The evidence leaves no doubt that this wye was clearly defined by its elevation from the surface, it having been previously graded for the railway, and it was continuously used as a highway by the public for at least 20 or 25 years, and kept in repair by those whose duty as officials exacted the care of streets and highways. Was this showing sufficient to warrant the conclusion that this road had been dedicated by the owner and accepted by the public? Dedication may be either express or implied. It is express when the purpose to devote a particular strip of land to highway purposes is by grant, as by deed. It is implied when an intention to devote the land to the public use is clearly manifested by the conduct of the owner. The *animus dedicandi* must exist in either case, but in neither is any particular formality of words required. An implied dedication of land for the public use as a highway may be established in any conceivable way by which the intent of the owner can be made apparent.

"The intent which the law means is not a secret one, but is that which is expressed in the visible conduct and open acts of the owner. The public, as well as individuals, have a right to rely on the conduct of the owner as indicative of his intent. If the acts are such as would fairly and reasonably lead an ordinarily prudent man to infer an intent to dedicate, and they are so received and acted upon by the public, the owner cannot, after acceptance by the

public, recall the appropriation. Regard is to be had to the character and effect of the open and known acts, and not to any latent or hidden purpose. If the open and known acts are of such a character as to induce the belief that the owner intended to dedicate the way to public use, and the public and individuals act upon such conduct, proceed as if there had been in fact a dedication, and acquire rights which would be lost if the owner were allowed to reclaim the land, then the law will not permit him to assert that there was no intent to dedicate, no matter what may have been his secret intent." Elliott on Roads and Streets (1st Ed.) 92 *et seq.*

As said in Greenleaf on Evidence (16th Ed.), Section 662:

"The right of the public does not rest upon a grant by deed, nor under a twenty years' possession, but upon the use of the land, with the assent of the owner, for such a length of time that the public accommodation and private rights might be materially affected by an interruption of the enjoyment."

The rule is laid down in *Wilson v. Hull,* 7 Utah 90 (24 Pac. 799), that:

"The intention of the owner of the land to dedicate may be inferred from his acquiescence in its continued use as a road by the public. In order to constitute acquiescence in a legal sense, the owner must know that the public is using his land as a road. There must be an act of the mind, a knowledge that the public is using the land as a highway, and a purpose on the part of the owner not to object. A knowledge of the use for such a purpose, without objection by word or act, may authorize the inference that the owner consents to the appropriation."

In *Schettler v. Lynch,* 23 Utah 305 (64 Pac. 955), the court declares that:

"The dedication may be inferred from long-continued

use by the public, with the knowledge of the owner, and
without objection by him."

Substantially the same doctrine is laid down in *Lona-
coning, M. & F. R. Co. v. Consolidation Coal Co.,* 95 Md.
630 (53 Atl. 420). See, also, *Tise v. Whitaker-Harvey Co.,*
146 N. C. 374 (59 S. E. 1012) ; *Hanger v. City of Des Moines,*
109 Iowa 480; *Dodge v. Hart,* 113 Iowa 685; *Pence v. Bry-
ant,* 54 W. Va. 263 (46 S. E. 275) ; and *City of Winchester
v. Carroll,* 99 Va. 727 (40 S. E. 37), in the syllabus of which
it is said:

"Acceptance may be by such long use by the public as
to render its reclamation unjust and improper. Both dedi-
cation and acceptance may be presumed by long user."

See Elliott on Roads and Streets (1st Ed.) 140.

In Pratt and MacKenzie's Law of Highways, at page
35, it is said that:

"When there is no direct evidence as to the intention of
the owner, an *animus dedicandi* may be presumed, either
from the fact that a way has been maintained and repaired
by a public body, or from the fact of public user without
interruption."

And later, on page 37:

"The presumption arising from long uninterrupted user
of a way by the public is so strong as to dispense with all
inquiry into the actual intention of the owner of the soil,
and it is not even material to inquire who the owner of the
soil was."

The author, in Angell on Highways, at Section 142,
points out that no particular formality is required for a
dedication, and that:

"It may be made either with or without writing, by any
act of the owner, such as throwing open his land to the pub-
lic travel, or platting it and selling lots bounded by streets
designated in the plat, thereby indicating a clear intention
to dedicate; or an acquiescence in the use of his land for a

highway, or his declared assent to such use, will be sufficient; the dedication being proved in most, if not in all, cases by matter *in pais*, and not by deed. The vital principle of dedication is the intention to dedicate,—the *animus dedicandi*; and, whenever this is unequivocally manifested, the dedication, so far as the owner of the soil is concerned, has been made. Time, therefore, though often a very material ingredient in the evidence, is not an indispensable ingredient in the act of dedication."

In *Rex v. East Mark*, (1848) 11 Q. B. *877, Lord Denman, C. J., in passing on the question, observed that:

"The law, as lately laid down, has led the courts into very inconvenient inquiries. If a road has been used by the public between 40 and 50 years, without objection, am I not to use it, unless I know who has been the owner of it? The Crown certainly may dedicate a road to the public, and be bound by long acquiescence in public user. I think the public are not bound to inquire whether this or that owner would be more likely to know his rights and to assert them, and that we have gone quite wrong in entering upon such inquiries. Enjoyment for a great length of time ought to be sufficient evidence of dedication, unless the state of the property has been such as to make dedication impossible."

In *Dawes v. Hawkins*, 8 C. B. (N. S.) 848, Williams, J., declared that:

"The law is clear that, if there has been a public uninterrupted user of a road for such a length of time as to satisfy the jury that the owner of the soil, whoever he might be, intended to dedicate it to the public, this is sufficient to prove the existence of a highway, though it cannot be ascertained who the owner of it has been during the time the road has been so used by the public."

It is clear, from these authorities and many others that might be cited, that an intent to give for a purpose, such as to dedicate for the use as a highway, must be shown to exist,

as well as an acceptance of such gift or dedication; and that these essentials may be established by circumstantial, quite as well as by direct, evidence, and are to be implied from the conduct of the owner and the acts of the public. Persons are presumed to intend the natural consequences of their own acts or omissions; and, if the owner allows the use of a defined strip of his land by the public as a highway; and it is improved as such by the public authorities at the public expense for a long period of time, and all this without objection, the natural and reasonable inference to be drawn therefrom is that he intended to devote said strip of land to such purpose.

In addition to the facts stated, it should be added that there was no proof concerning the right, if any, under which the wye connecting the railroads was held. For all that appears, it may have been held under an easement, in which event eight years must have elapsed before it reverted to the owner of the fee. See *Remey v. Iowa Cent. R. Co.*, 116 Iowa 133. If held by deed, the ownership during this long period was not proven. Because of the embankment, it may not have been of much use to the owner of the fee or to the owner of the abutting land. This may account for their putting no objection to its use by the public. Nor was the ownership of the land during the period mentioned shown, though it appears that Miller owned the land through which the way extended, at the time of the trial and for some years previous. A highway existed at the east line of the incorporated town, passing over the bridge onto the business portion of Melbourne. The use may have been merely permissive, until the construction of the overhead crossing. In view of all these circumstances, which should be taken into consideration in connection with the long use, we are of opinion that whether there was a dedication of the way as a road should have been submitted to

3. Highways: dedication by conduct.

the jury, under proper instructions, and that the court erred in assuming that from A to B and on over the crossing was a public highway.

The appellant argues that the Chicago, Milwaukee & St. Paul Railroad Company is estopped from insisting that the crossing was not a public crossing, for that they maintained the same, and induced those traveling same to make use of it as such. This conclusion is obviated by the fact that, about the first of July, 1913, the railroad company had taken up the crossing, and the wye had been fenced, and that this condition existed from then on until the collision; and therefore, the doctrine has no application. Because of the error in the instruction directing the jury that the evidence showed conclusively that the crossing was a public crossing, the judgment must be reversed.

4. RAILROADS: estoppel to dispute public nature of crossing.

Some other rulings are complained of; but, as they are not likely to occur on another trial, it is not necessary to review them. For the error pointed out, the judgment is— *Reversed.*

EVANS, PRESTON, and SALINGER, JJ., concur.