## LATHROP et al. v. SLATER et al.

(Third Division.   Cordova.   March 1, 1920.)

No. C–173.

**Dedication ☞20(2)—Streets—Municipal Corporations.**

In Cordova, Alaska, lots 7 and 8 and lots 25 and 26 lie, respectively, on opposite sides of double block No. 7; lots 7 and 8 facing on First street, and 25 and 26 facing on Second street; 7 and 8 are separated from 25 and 26 by an alley 14 feet wide, which runs north and south through the block; the dividing line between 7 and 8, extended, is the dividing line between 25 and 26. When the owners of these four lots erected buildings on their respective lots, by common agreement they left open a through way, along the common dividing line of these lots, from First to Second streets, 8 feet wide; 4 feet being allowed off each lot. The owners of lots 7 and 8 erected two-story buildings, but the second stories of the buildings were extended over the way, so as to join on the upward continuation of their common line, thus leaving a way 8 feet wide, level with Front street, and 10 feet high to the second story. The owners of lots 25 and 26 set their respective buildings 4 feet in from their common line, thus leaving a way from First to Second streets, on a level with those streets, through the center of the block. This 8-foot way was graded and planked, lighted at each end and in the middle by street lights furnished by the municipality. Doors were cut in the buildings along the way, which was 414 feet long, and extended from First to Second street, and for more than 10 years it was publicly used by pedestrians more extensively than either of the end streets, as a public way. After more than 10 years' public use, the owners of the lots mentioned took steps to close the way. The plaintiffs brought suit to enjoin the closing, alleging its long use and special injury to them by reason of their buildings and business dependence upon it. *Held*, the alley became a public way by implied dedication to that use by the owners of the lots along whose common line it ran, and the court will enjoin its closing by them. Injunction granted.

All the parties to this action are owners of town lots in the incorporated town of Cordova, Third judicial division, territory of Alaska. The plaintiffs seek to enjoin the defendants from closing a certain alley in the town of Cordova which will hereafter be referred to as "Burkhart alley." Plaintiffs plead a special and different damage from that sustained by the general public, and bring action to protect their own rights and for

and on behalf of the general public of the town of Cordova. The foregoing brief statement discloses the nature of the action. Issue having been joined, the case was tried to the court without a jury.

Donohoe & Dimond, of Valdez, for plaintiffs.

E. F. Medley and B. O. Graham, both of Cordova, and E. E. Ritchie, of Valdez, for defendants.

BUNNELL, District Judge. The town site of Cordova is located for the most part upon a very rough and uneven hillside. First street, the principal business street of the town, runs north and south. East of First street, and parallel with it, is Second street. The distance between the two streets is 214 feet. Block 7 lies between the two streets. It is subdivided into 32 lots, each 25 feet in width and 100 feet in depth. It is bounded on the north by C street and on the south by B street. An alley 14 feet in width, parallel with First street and Second street, runs through the entire block.

First street slopes to the south; second street slopes to the north; C street slopes to the west, intersecting with First street at an elevation of about 8 feet lower than its intersection with Second street. The result is that B street is very steep; its intersection with Second street being at an elevation of about 26 feet higher than its intersection with First street. Lots 7 and 8 front on First street and directly back of them are lots 26 and 25, respectively, fronting on Second street. On First street and across the street from lots 7 and 8 is located the "Lathrop Building" the property of A. H. Lathrop, one of the plaintiffs. The plaintiff Alice Johnson is the owner of lot 25 upon which is located a building known as the "Burkhart. Apartments." The defendant H. A. Slater is the owner of lot 7, upon which is located the "Slater Building." The Bank of Alaska, a corporation, is the owner of lot 8, upon which is erected a substantial business building. It will thus be seen that lots 7, 8, 26, and 25 are approximately in the middle of the block. Block 7, and particularly that portion of it fronting on First street, is in the main business portion of the town.

"Burkhart alley" begins on First street, and extends through Block 7 to Second street. It is 8 feet in width. This 8 feet is made up from the south 4 feet of lots 7 and 26 and the north 4 feet of lots 8 and 25. It intersects at right angles the alley

heretofore described as being 14 feet wide in the middle of the block and parallel with First and Second streets. As shown by Defendants' Exhibits 1 and 2, "Burkhart alley," for the first 100 feet running back to Second street, is entirely covered over by the "Slater Building" and the building of the Bank of Alaska. The walls of these buildings meet at the height of 12 feet from the sidewalk on a line directly above the boundary line of lots 7 and 8. The first 100 feet of "Burkhart alley" is level, and covered with a board walk. At the point of intersection with the alley running north and south through the block, "Burkhart alley" continues up a sharp incline to Second street. The "Burkhart Apartments" and the buildings across from it on "Burkhart alley" are both built 4 feet back from the boundary line between lots 26 and 25; but, as is shown on Plaintiffs' Exhibit A and Defendants' Exhibit No. 2, a walk 20 inches wide, constructed on a line between the basement and the first story of the "Burkhart Apartments," extends into the "alley" the distance of its width along the "Apartments." This walk is necessary to enable occupants to have a side entrance from the "alley" to rooms in the "Apartments" on the first floor. The "alley" is planked from Second street to the rear of the "Slater Building" and the building of the Bank of Alaska.

As shown by Defendants' Exhibit No. 3 there are two entrances to the "Slater Building" from "Burkhart alley"; also two entrances to the building of the Bank of Alaska. At the entrance to "Burkhart alley" from Second street the town maintains a street light, and directly across Second street from the light the town maintains a fire hydrant. It also maintains a light in "Burkhart alley," very near the rear of the "Slater Building" and the building of the Bank of Alaska. The town maintains a crosswalk across First street to the sidewalk in front of the "Lathrop Building." This crosswalk is 6 feet wide, and its center line appears to be a projection of the center line of "Burkhart alley." The foregoing description of the present physical condition of the premises is in accordance with the evidence, all of which is verified by a personal viewing of the premises.

A stipulation entered into by the attorneys of the parties hereto, and filed as Defendants' Exhibit No. 6, traces Slater's title to lot 7 back to a land contract dated June 12, 1908, en-

tered into between George C. Hazlett, trustee, and Robert Ashland, followed by a warranty deed, dated June 16, 1909, from the said Hazlett to the said Ashland; the title of the Bank of Alaska to lot 8 to a land contract dated June 4, 1908, entered into between George C. Hazlett, trustee, and A. E. Burkhart, followed by a warranty deed, dated July 12, 1909, from the said Hazlett to the said Burkhart; the title of Alice Johnson to lot 25 to a warranty deed dated October 1, 1908, from the Copper River Railway Company to H. B. Burkhart; and the title to lot 26, now being in the Carstens Packing Company, to a land contract dated June 9, 1908, entered into between Geo. C. Hazlett, M. Finkelstein, and J. Sapiro, running from the said Hazlett to the said Finkelstein and Sapiro.

The witnesses Robert Ashland, Dave McDonald, and M. Finkelstein testify that the owners of lots 7, 8, 26, and 25, at the time buildings were constructed thereon, created "Burkhart alley" under a belief that it could be closed by them whenever they saw fit so to do. It is testified that the passageway was for the convenience of the owners in conducting their respective lines of business; but the silent witnesses, the buildings themselves, together with all the other testimony in the case, show that this passageway was for the purpose of affording the public easy access to the respective places of business conducted on these lots, rather than for the convenience of the property owners. To fully understand the advantage "Burkhart alley" was to the business interests being conducted on these lots, one must bear in mind that block 7 is 400 feet long by 214 feet in width, and that "Burkhart alley" cuts it in two at about its center, thus making each of lots 7, 8, 26, and 25 an alley corner. B street is very steep, and it naturally follows that the average pedestrian, especially in inclement weather, in going from First street to Second street, travels through "Burkhart alley," with its passageway covered for nearly half of its entire length. The owners of these properties made the strongest kind of a bid for business by creating "Burkhart alley" and the testimony shows that the foot travel through this "alley" has for years exceeded the entire foot travel on both B and C streets. The owners of these properties are to be commended for their business acumen in thus bringing the public to their very doors.

The evidence further discloses that the town authorities were not unmindful of the importance of "Burkhart alley" as a thoroughfare. It was neither an arcade, nor was it a cul de sac, and I am unable to agree with the contention of counsel that the board walk, 8 feet wide and 100 feet long, constructed over portions of lots 7 and 8, was in the nature of a "platform." From "Burkhart alley" the town maintained a crosswalk across First street, put in hydrants in a position commanding the "alley," maintained a street light at the Second street entrance, and since 1915 lighted the "alley" at the rear of the buildings on lots 7 and 8. The town exercised dominion over the "alley" through its police department, requiring the owners of lots 7 and 8, 26, and 25 to keep the walk in repair, remove obstructions placed therein by the owners and their tenants, and to remove accumulations of snow. The course of conduct by the police with reference to the user of the "alley," the conduct of the owners in granting, in fact inviting, such use, and the action of the town in exercising dominion over it, have been continuous for a period of more than 10 years.

It is argued by counsel for the defendants that neither the present owners nor their predecessors in interest ever intended to grant an easement to the public to use "Burkhart alley"; that the paying of taxes on the lots, keeping the "alley" in repair, maintaining an awning over the First street entrance, paying for a light in about the center of the covered portion, making use of it in various ways incident to a use of the buildings abutting thereon for business purposes, negatives any dedication on the part of the owners, and that the joining of the buildings on lots 7 and 8 at the second story for the entire depth of these lots is conclusive proof that there was no right acquired by the public or any one else, either by prescription or by implied dedication.

The distinguishing feature of this case, as compared with any cited by counsel, or any I have been able to find, is the joining of the buildings on lots 7 and 8 at the second story. Ordinarily we think of a street or an alley as having unlimited overhead room. This, however, is not absolutely necessary. The owners of lots 7 and 8 could dedicate a limited or an unlimited overhead space. They elected to dedicate a space 8 feet wide, 12 feet high, and 100 feet in length. It was a mat-

ter entirely within their control. The question is neither how much nor how little they dedicated. The public accepted the limited space dedicated from lots 7 and 8; the space dedicated from lots 26 and 25 limited as to width, but unlimited as to height. I am convinced that the plaintiff Lathrop has shown a damage special and different from that sustained by the general public though it is not so clear and persuasive as that shown to be sustained by the plaintiff Johnson. If "Burkhart alley" is closed, she sustains a very serious damage, as shown by all the evidence. Access to her property through the alley running through the block from B street to C street would be of little service, even if it were kept in good condition. The evidence shows that its greatest service to the public is as a measure of fire protection and storage room in the winter for snow from the roofs of the abutting buildings.

In the consideration of this case the court has been greatly assisted by exhaustive briefs filed by counsel. In my opinion, the facts in this case show by a fair preponderance of the evidence that, from the time the owners of lots 7, 8, 26, and 25, in block 7, first constructed buildings thereon, until the defendants in 1919 undertook to close "Burkhart alley," the said owners and their successors in interest impliedly dedicated "Burkhart alley" as herein described to the use of the general public.

In 18 C. J. p. 53, it is stated:

"2. *Intent Manifested by Acts Decisive.*—The intention to dedicate to which courts give heed is not an intention hidden in the mind of the landowner, but an intention manifested by his acts. It is not always necessary that an actual intention should exist in the mind of the owner at the time of the alleged dedication. If the intention is clearly expressed by his open acts and visible conduct, the public and individual citizens may act upon it; and the fact that the owner may have entertained a different intention from that manifested by his acts or declarations, or that in making the dedication he may have acted under a mistake of fact, is of no consequence; and if the owner showed an intent he cannot defeat the effect of his acts by subsequently stating that he did not intend to make a dedication."

Continuing, on page 57, the author says:

"*Implied Dedication.*—a. *In General.*—One of the methods of acquiring the right to the use of land for the public is that of the implied dedication of the same by the owner of the fee. A dedication is implied when the acts and conduct of the owner manifest an intention to devote the property to public use, and are incon-

sistent with any other theory than that he intended a dedication. It arises by operation of law, and, according to many decisions, is founded upon the doctrine of estoppel in pais, and not upon grant. Under some circumstances a dedication will be implied even against the express declarations of the owner of the land. Whether a dedication has been made is essentially a question of fact, and a fact which may be established by indirect evidence, as no formalities in making a dedication are essential." Cincinnati v. White, 6 · Pet. (31 U. S.) 289, 8 L. Ed. 452; Riley v Buchanan, 116 Ky. 625, 76 S. W. 527, 63 L. R. 642, 3 Ann. Cas. 788; Kennedy et al. v. City of Portland, 92 Or. 300; 179 Pac. 667; In re Roosevelt Ave. in City of New York, 186 App. Div. 457, 174 N. Y. Supp. 600; Evans v. City of Brookings, 41 S. D. 225, 170 N. W. 133; Wensel v. Chicago, M. & St. P. Ry. Co., 185 Iowa, 680, 170 N. W. 409; 8 R. C. L. § 25, p. 900; Humphrey et al. v. Krutz et al., 77 Wash. 152, 137 Pac. 806; Robison v. Gebauer, 98 Neb. 196, 152 N. W. 329; Pittsburg, C., C. & St. L. Ry. Co. v. Ervington, 59 Ind. App. 371, 108 N. E. 133.

The discussion of the law on the subject of dedication in · Keppler v. City of Richmond, 124 Va. 592, 98 S. E. 747, is very illuminating. The facts, however, did not permit the Supreme Court to affirm the decision of the chancery court. In re Stees, 142 Minn. 340, 172 N. W. 219, is also of interest, in that it shows how the owner of the property for a period of 20 years kept his boundary line marked conspicuously upon the sidewalk. In the case at bar it will be remembered that there was no such distinctive marking, nor did the owners of lots 7 and 8 ever put up any sign at either entrance to "Burkhart alley," or anywhere else therein, designating it as a "private way." A keen observer might notice that, at a point beginning in the center of the "alley" at the second story, there is a board about 6 inches in width running to the cornice. The cornice, however, continues along the front of both buildings on the same line, and without a break at the dividing line. The siding, also, is board for board on the same line from the cornice to the beginning of the second story. I do not think the public could reasonably be held to be put upon inquiry as to boundary lines by the style of building. The public was not interested in the second story, except in so far as it afforded protection in inclement weather.

There is some evidence showing that the owners of lots 7 and 8 use a portion at least of the space under the sidewalk through the "alley," and therefore it is contended by the defendants that the easement, if such it is, amounts to nothing

more than an easement of a "hole in the air." In answer to this it may be said that the public is not concerned with what use is made of the space under the walk. If the defendants choose to term it merely a "hole in the air," such a description will not affect the rights of the plaintiffs or of the general public. In fact, that is exactly what they are now insisting it is and has been, and that it be maintained. See In re Third Ave., of City of New York, 145 App. Div. 244, 130 N. Y. Supp. 80–84.

Findings of fact and conclusions of law in accordance with the views herein expressed may be prepared and submitted.

⬅See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes