# THE LONACONING MIDLAND AND FROSTBURG RY. CO. *vs.* THE CONSOLIDATION COAL CO.

*Highways—Dedication to Public Use and Acceptance—Electric Railway on County Road Not an Additional Servitude.*

A county road was straightened by substituting a cut-off thirty feet wide and five hundred feet long across an adjoining tract of land, and this substituted road was afterwards used for years by the public without objections by the owner of the land who had full knowledge thereof. The new road was kept in repair by the County Commissioners, and the land owner conveyed abutting property by a deed describing said road as a county road. *Held*, that the evidence in the case shows that the new road had been dedicated by the owner to public use and accepted by the County Commissioners.

The construction of an electric passenger railway on a county road with the consent of the County Commissioners and in such a way as to preserve a part of the road for ordinary travel does not impose an additional burden for which the owner of the road-bed is entitled to compensation.

Appeal from a decree of the Circuit Court for Allegany County (STAKE, J.)

The cause was argued before McSHERRY, C. J., BOYD PEARCE, SCHMUCKER and JONES, JJ.

*Benj. A. Richmond* and *D. J. Blackiston*, for the appellant.

*Robert H. Gordon* and *Arch. A. Young*, for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

Two questions are presented for our consideration by this appeal. The first is whether a certain road has been so dedicated to public use and accepted by the public as to constitute it a public highway. The second is whether the construction and use of an electric railway upon a portion of the bed of that road imposed a new easement thereon not contemplated in its dedication to public use.

The decree appealed from was passed by the Circuit Court for Allegany County and it made permanent an injunction restraining the appellant from constructing or operating its railway on a portion of a road leading from Frostburg to Lonaconing. The material facts appearing from the record are as follows :

In the year 1882 a road was opened from the Legislative road at Wright's crossing in Allegany County to Frostburg, thus making a continuous road from that town to Lonaconing. This road, as it was opened at that time, passed through Grahamtown and was commonly known as the Grahamtown road but the entire road from Frostburg to Lonaconing was frequently called the Legislative road.

The record does not show all of the steps of a formal condemnation and opening of the Grahamtown road as a public road, but it does appear that in the spring of 1882 the County Commissioners appointed three road examiners and a surveyor to lay out a new road from Frostburg to connect with the Legislative road from Lonaconing at Wright's crossing. John H. Ward the surveyor, testified that he located and surveyed the road, and Willison, the sole survivor of the three examiners, testified that they met to lay out the road but owing to some objection adjourned with the intention of meeting again, although he was unable to remember that they met again or ever made any report. The minutes of the proceedings of the commissioners contain the following entry:

*April 19th, 1882.*

"*In the matter of proposed new road from National pike through lower part of Frostburg to the Legislative road, near Wright's crossing, the report of the examiners, James Kean, A. J. Willison and Dr. A. B. Price, was adopted, and $600.00 ordered to be levied in June, 1882, to open same. John Johns was appointed supervisor for the work.*"

John Johns testified that he as supervisor in 1882 constructed the road from Wright's crosing, in part through the appellee's land, to Frostburg and made it ready for travel at a cost of $900 which was paid by the County Commissioners·

John Layman testified that in 1882 he helped to fence and construct the road under John Johns, the supervisor, and that it was laid out for a county road and was stoned and ditched and culverts and bridges were built on it wherever necessary.

The Grahamtown road passed through a tract of land called "Walnut Park" owned by the appellee and lying near Frostburg. There was a bend or curve in the line of the road, as originally laid out and used, through this tract of the appellee's land.

About the year 1892 the appellee leased a portion of this land to the Frostburg Driving Park Association which has ever since then continued to hold it as lessee. In order to enable the Driving Park Association to construct a race track located partly on the bed of the curve in the road the latter was straightened by substituting for the former curve a cut-off of the same width, about thirty feet, as the old road and five hundred feet long across the appellee's land. The old curved road-bed was then closed to travel and fenced into and made part of the lot leased to the Driving Park Association and the cut-off has since then been used in its stead as part of the continuous road.

The bill of complaint alleges that this cut-off was *laid out and constructed by the appellee* but asserts that it was intended only for the uses of the Driving Park Association and for the private use of such other persons as the appellee might permit to enjoy it. The evidence shows that it was opened and fenced under the direction of A. B. Randolph, the mine superintendent of the appellee who had charge of its real estate near Frostburg. The appellant was engaged in laying its tracks upon this cut-off when it was enjoined and both parties conceded at the hearing of the case that its right to use that portion of the road was the real question at issue.

The uncontradicted evidence of many witnesses appearing in the record establishes the fact that this entire road from Wright's crossing, to Frostburg, including the curve on the appellee's land while that was in use and since then the cut-off, has been freely and constantly used by the public as a

road for the passage of pedestrians and vehicles of all kinds
without objection or interruption on the part of the owners of
the soil over which it passed. The construction of the road, in
the manner already mentioned, and its use by the public were
too open and notorious to have been unknown to the owners
of the soil under it and the only reasonable inference to be
drawn from the absence of objection on their part is that they
voluntarily acquiesced in and assented to such opening and
use. It affirmatively appears from the evidence that the ap-
pellee must have been aware of this public construction and
use of the road as its mine manager travelled over it almost
every day. Randolph himself, the appellee's agent under
whose direction the cut-off was opened and substituted for the
former curve in the road testified without contradiction that
the appellee knew of its public use ever since its opening and
made no objection to it.

Furthermore, the minutes of the proceedings of the County
Commissioners of Allegany County show that from the first
opening of the Grahamtown road in 1882, they exercised
control over it as if it were a county road. They originally
constructed and from time to time repaired it with the public
monies in their charge. These minutes also show the ap-
pointment of a supervisor for the road in each year since 1892
and annual appropriations of money for its repair during
almost all, if not all of that time.

The record shows that the appellant was duly incorporated
with power to construct and operate an electric railway be-
tween the two towns and that it had obtained the written con-
sent of the County Commissioners to lay its tracks upon the
road now under consideration.

So long time has elapsed since the adoption in April, 1882,
by the County Commissioners of the report of the examiners
to lay out the Grahamtown road that it might well be pre-
sumed for the purposes of this collateral proceeding that the
other steps requisite to its formal condemnation had been reg-
ularly taken at that time. *Tyson* v. *Commissioners of Balti-
more County*, 28 Md. 525. But if it was not regularly con-

demned and opened, the testimony to which we have already adverted and other evidence of like tenor appearing in the. record would in our opinion afford ample ground for holding the road to have been dedicated by the owners of the land through which it ran to public use as a highway. Its acceptance on the part of the public is equally clear. It has been for so many years managed and cared for by the county authorities at the public expense that it has become to all intent and purposes a county road.

"There is no particular form or ceremony necessary in the dedication of land to public use. All that is required is the assent of the owner of the land and the fact of its being used for the purposes intended by the appropriation." *Cincinnati* v. *White*, 6 Pet. 431, 440; *Morgan* v. *Chicago & Alton R. R. Co.*, 96 U. S. 723. This assent need not be expressed in any particular manner, but it may be implied from the conduct of the owner of the land. *Elliott on Roads and Streets*, sec. 133; *Carr* v. *Kolb*, 99 Ind. 53; *Noyes* v. *Ward*, 19 Conn. 520; *Abcott* v. *Mills*, 3 Vt. 527. No conveyance of the land is necessary nor need there be any grantee *in esse* to take the title, "but if the owner of the land has done such acts *in pais* as amount to a dedication he is thereby estopped from denying that the public have a right to enjoy what is thus dedicated to their use or from revoking what he has declared by his acts." *McCormick* v. *Mayor*, 45 Md. 523; *Hiss* v. *B. &. H. P. R. R. Co.*, 52 Md. 250. Dedication is purely a question of intention and any act or acts of the owner of the land clearly manifesting such intention is sufficient.

The evidence of the intent of the appellee to dedicate to public use the cut-off portion of the road in question is especially clear. It leased to the Driving Park Association a lot whose boundaries included the bend or curve in what was an existing and much travelled road. It thereupon laid out, constructed and fenced the cut-off so that it would serve as a substitute for the curved portion of the then existing road and then closed up the curve and included it in the Driving Park lot. Furthermore, in its lease of the Driving Park lot, which

was a formal conveyance signed by its president, the road now in question was mentioned as a landmark and was called "the county road" thus recognizing its public character.   Since that time the public have constantly used the cut-off as part of the Grahamtown road and as the evidence shows have done so with the knowledge of the appellee and without objection on its part.   In the case of *Prouty* v. *Bell*, 44 Vt. 71, the substitution of a new piece of road for portion of an old one and the enclosure and use of the abandoned portion of the old road by the owner of the soil were held to be unequivocal acts of dedication of the substituted road.

The question yet remaining to be considered is whether the appellee was entitled to the injunction upon the ground that the construction and operation by the appellant of an electric railway upon this county road will impose upon it an additional burden or servitude for which the appellee as owner of the fee is entitled to compensation before the road can be put to such use.

The introduction of the modern street railway on which the cars were at first drawn by horses and have more recently been propelled by electricity or other inanimate power has given rise to numerous cases in which this question has been the leading issue.   Conflicting views have been expressed on the subject by the different Courts and opposite conclusions have been reached by them.   In this State, however, it has uniformly been held that the easement acquired by the public in a street or highway was the right to use it " not only according to the then existing modes of travel and transportation, but all such other modes as may arise in the ordinary course of improvement."

In *Hodges' case*, 58 Md. 603, it was held that the use of the streets of a city by a horse passenger railway was not a new and distinct servitude ; in *Peddicord's case*, 34 Md. 463, the same doctrine was applied to the use by a horse railway company of the Frederick turnpike from Baltimore to Ellicott City; in *Hiss case*, 52 Md. 242, the same thing was held of a horse railway constructed upon the bed of a suburban road.   In

*Koch's case*, 75 Md. 222, the same proposition was applied to the use by an electric road of the streets of a city and in *Green's case*, 78 Md. 306, and *Poole's case*, 88 Md. 533, the same doctrine was applied to the location and use of an electric road in the first case from Baltimore to Towson on the York turnpike and in the other case from Baltimore to Mt. Washington on the Falls turnpike.

The substantial ground upon which all of these cases were decided was that the horse or electric railroad was a new and improved method of transit which afforded the people greater facilities in the use for which a public highway was intended. The decisions in the three last mentioned cases held the use of a public road by electric cars to be one of its legitimate uses, but this Court has at no time given countenance to the view that the electric cars could monopolize the entire roadway or so much of it as to prevent its convenient use by persons traveling it on foot or with horses or vehicles whose rights to the use of the road will remain the same as before.

In the present case the record shows that the consent of the County Commissioners to the use of the road in controversy by the appellant's railway is coupled with such conditions and stipulations as will secure the preservation and maintenance of a macadamized roadway of sufficient width for the accomodation of such persons as may continue to use it in the ordinary methods of travel.

The decree appealed from will be reversed without remanding the case.

*Decree reversed with costs and bill dismissed.*

(Decided November 20th, 1902.)