# DEPARTMENT OF NATURAL RESOURCES ET AL. *v.* MAYOR AND COUNCIL OF OCEAN CITY ET AL.

[No. 64, September Term, 1974.]

*Decided February 21, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Hamilton P. Fox*, with whom were *Hearne, Fox & Bailey* on the brief, for E. T. Park, Inc., part of appellants. *Warren K. Rich, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Henry R. Lord, Deputy Attorney General*, on the brief, for Department of Natural Resources, other appellant.

*Patrick L. Rogan, Jr.*, with whom were *Richardson, Rogan, Anderson & Heland* on the brief, for 71st Street, Inc., part of appellees. *Dale R. Cathell, City Attorney*, for Mayor and City Council of Ocean City, other appellee.

SINGLEY, J., delivered the opinion of the Court. ELDRIDGE, J., dissents and filed a dissenting opinion at page 15 *infra*.

This case raises for the first time the extent of the rights which neighboring owners and members of the public may respectively have in the littoral at Ocean City, Maryland — that portion of the beach which lies west of the Atlantic Ocean's mean high tide line, referred to in this opinion as "mean high water mark."

The area involved is a development originally known as Oceanbay City, first platted in 1940. E. T. Park, Inc. (Park), one of the petitioners, is a corporation owned by Dr. Nicholas J. Kohlerman. Park owns lots 22 and 23 in block 38

of Oceanbay City improved by a residence occupied by Dr. Kohlerman. These lots front 100 feet on the south side of what is known locally as 71st Street with a depth of 120 feet, lying generally to the rear of an ocean front tract 100 feet in width and 120 feet in depth, known as lots 4 and 5 in the same block, owned by 71st Street, Inc. (the Developer).[1] When Park learned that the Developer had filed an application for a building permit for the construction of a condominium on its ocean front tract, an action was instituted by Park in the Circuit Court for Worcester County against the Developer; the Developer's builder; the Mayor and City Council of Ocean City (the City), and the City's building inspector, which sought to enjoin the construction of the condominium and the issuance of a building permit by the City.

Park's complaint was grounded on the contention that it, along with the general public, had acquired an easement by implied dedication, prescription, or custom permitting use as a public beach of the area between the mean low water mark on the east and the line of vegetation on the west, and particularly the dry sand area lying between the Developer's lot line on the east and the line of vegetation on the west. It was contended that the building to be erected would have its eastern front at the Ocean City building limit line and would be almost entirely to the east of the dune line, which is generally the same as the line of vegetation. As a result, the dry sand beach would be narrowed and might at times be covered by wave action, thus effectively denying the public use of the beach.

On petition filed after the action had been instituted, State of Maryland, Department of Natural Resources (the State) was permitted to intervene as party plaintiff. From an order denying the injunctive relief prayed, Park and the State appealed to the Court of Special Appeals. On motion of the petitioners, we granted certiorari.

---

1. Lots 4 and 5 were platted as ocean front lots in 1940. In 1963, the front lot lines were moved back 150 feet to reflect the erosion occasioned by the March, 1962 storm, and six lots were eliminated from the block.

Ocean City is located on one of a system of barrier islands which parallels the mainland along the Atlantic coast from Florida to New England. Because of the low elevation and unprotected character of the islands on the Maryland-Delaware coast, they are particularly susceptible to wave and wind action.

There was testimony below that the beach where the Developer's tract is located underwent a process of accretion in the 79-year period ending in 1929, when it gained width at an average of 1.6 feet annually. From 1929 to 1947, it lost some 270 feet through erosion. After the unusual storm of March, 1962, it was 450 feet narrower than it had been in 1922.

For the past 35 years, protective measures have been undertaken, at first with funds supplied by the State of Maryland. These consisted of the placing of sand fences, the construction of asphalt groins, and the bulldozing of sand.

After the 1962 storm, and the designation of the Ocean City beach as a National Disaster Area, the reconstruction of a dune line was commenced by the U.S. Army Corps of Engineers. The Developer's predecessors in title joined with other property owners in granting a perpetual easement to Worcester County for the construction and maintenance of the dune.[2]

___

2. The agreement creating the easement grants, in pertinent part:

". . . a perpetual easement across the aforesaid property for the purpose of constructing, reconstructing and maintaining a sand dune barrier (to be constructed or reconstructed originally by the Corps of Engineers of the U.S. Army) for the protection of our property, the other property in this vicinity and the public generally, but in connection therewith do grant the further right to construct and maintain across our property sand fences or such other protective devices as may be necessary, it being understood and agreed that the County Commissioners of Worcester County, their agents, employees, successors and assigns are hereby vested with all rights, powers and authority necessary for the construction, reconstruction, repair and maintenance of said dune barrier, sand fences or other protective devices, including the right to enlarge said dune barrier if it is subsequently determined that such action is necessary for the protection of property."

There is a further provision:

". . . that any improvements or other facilities to be constructed or

So long as the dune lay outside the limits of the City, the County Commissioners refused to issue building permits for construction east of the dune line. Some years after the 71st Street area was annexed by Ocean City in 1965, the County took the position that it was no longer responsible for the maintenance of the dune. As a consequence, the City proceeded to delineate a building limit line east of structures then existing, which in this area was east of the dune line.

As regards the public's right to use the foreshore, the area extending easterly from the mean high water mark, there can be little doubt, *Shively v. Bowlby,* 152 U. S. 1 (1894). It has long been held that navigable water and the land under it is held by the State, for the benefit of the public, *Smith v. Maryland,* 59 U. S. 71 (1855); 1 R. Clark, Waters and Water Rights §§ 36.3 (B)-(C), at 192-94, 42.1, at 264-67 (1967); 1 Patton, Land Titles § 135, at 352-54 (2d ed. 1957).[3] At the time of the grant of the Charter by Charles I to Lord Baltimore, it was owned by the Crown and transferred to the proprietor, *Browne v. Kennedy,* 5 H. & J. 195 (1821) and after the Revolution has been held by the State for the benefit of the public by virtue of Article 5 of our Declaration of Rights, *Board of Public Works v. Larmar Corp.,* 262 Md. 24, 277 A. 2d 427 (1971); *Kerpelman v. Board of Public Works,* 261 Md. 436, 276 A. 2d 56, *cert. denied,* 404 U. S. 858 (1971). *See also Day v. Day,* 22 Md. 530 (1865); *Baltimore v. McKim,* 3 Bland 453 (1831). Prior to the enactment of

---

erected on the aforesaid premises will be done in accordance with permits to be issued by said County Commissioners and will be constructed or erected in such manner as will permit the free and unhampered flow of littoral currents and sand, thus avoiding as much as possible any disturbance or destruction of said dune barrier, sand fences or other protective devices, it being UNDERSTOOD AND AGREED that at such times as said County Commissioners, their successors and assigns may determine that the rights and easements herein granted are no longer necessary for the purposes intended, then and in that event the same shall cease to exist."

3. In some states, notably Massachusetts, Maine and New Hampshire, private ownership of the littoral extends to mean low water, subject, however, to public right of passage — *see* Lakeman v. Burnham, 73 Mass. 437 (1856); Gerrish v. Proprietors of Union Wharf, 26 Me. 384 (1847); M. Frankel, Law of Seashore Waters and Water Courses (1969); 3 American Law of Property § 12.34, at 273-75 (A. J. Casner ed. 1952).

Chapter 129 of the Acts of 1862, now Maryland Code (1957, 1972 Repl. Vol.) Art. 54, § 48, there were instances where the State issued patents for land under navigable water, defined by our cases as water where the tide ebbs and flows, *Van Ruymbeke v. Patapsco Industrial Park,* 261 Md. 470, 475, 276 A. 2d 61, 64 (1971).

This protects the public in the use of the foreshore only, however.[4] If a right of access is claimed over fast land, or there is an assertion of right of user of such of the dry sand littoral which lies west of the front property line, it must find support elsewhere.[5] In instances where there has been a prior grant of the foreshore to the owner of the littoral, the public's right to make use thereof is limited to navigation and fishing, 2 H. Tiffany, Law of Real Property § 659, at 697 (3d ed. 1939). The notion that the rights of the owner of the littoral must be exercised in subordination to the paramount rights of the public is no longer applicable, since rights of fishing, boating, hunting, bathing, taking shellfish and seaweed and of passing and repassing have been *pro tanto* extinguished by the prior grant, *Town of Orange v. Resnick,* 94 Conn. 573, 109 A. 864 (1920). *See* Comment, 31 Mich. L. Rev. 1134, at 1135-39 (1933).

In recent years, as a result of an expanding population and a limited amount of shore line, courts have been confronted more frequently with the problem posed by this case. Clark, *supra,* § 36.4 (B), at 200-02. In some instances, the result sought by Park has been predicated on dedication. *Gewirtz v. City of Long Beach,* 69 Misc. 2d 763, 330 N.Y.S.2d 495 (Sup. Ct. 1972), *aff'd,* 358 N.Y.S.2d 957 (1974); *Gion v. City of Santa Cruz,* 2 Cal. 3d 29, 465 P. 2d 50, 84 Cal. Rptr. 162 (1970); *Borough of Neptune City v. Borough of Avon-by-the-Sea,* 61 N. J. 296, 294 A. 2d 47 (1972); *Seaway*

---

4. The English rule is sometimes said to be more restrictive as regards the use of the foreshore, relying on Blundell v. Catterall, 5 B. & Ald. 268, 100 Eng. Rep. 1190 (1821). *See* J. Angell, The Right of Property in Tide Waters, at 17-35 (2d ed. 1847).

5. At argument, counsel for the respondent 71st Street, Inc. conceded that there was no challenge to public access to the foreshore by the use of dedicated streets which ended at the beach.

*Co. v. Attorney General,* 375 S.W.2d 923 (Tex. Civ. App. 1964); Clark, *supra,* § 38.2 (B), at 227-30. *Compare, United States v. Certain Land in County of Worcester, Md.,* 311 F. Supp. 1039 (D. Md. 1970).

Other cases have suggested that an easement may be created by prescription, *Gion v. City of Santa Cruz, supra; State ex rel. Thornton v. Hay,* 254 Or. 584, 462 P. 2d 671 (1969); Clark, *supra,* § 38.2 (A), at 225-27. Finally, there is some possibility that support could be found in custom, *State ex rel. Thornton v. Hay, supra; Knowles v. Dow,* 22 N. H. 387 (1851), or by invoking a concept of public trust, *Borough of Neptune City v. Borough of Avon-by-the-Sea, supra,* 61 N. J. at 309-10, 294 A. 2d at 54-55. *See generally* Degnan, *Public Rights in Ocean Beaches: A Theory of Prescription,* 24 Syracuse L. Rev. 935 (1973); McKeon, *Public Access to Beaches,* 22 Stanford L. Rev. 564 (1970); *The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine,* 79 Yale L. J. 762 (1970).

In considering the petitioners' contentions, the chancellor (Prettyman, J.) noted that much of the littoral in Ocean City had been dedicated to public use by recorded plats, in which areas east of the easterly lot lines had been designated "beach," "boardwalk" or as the location of a public way, all of which had been accepted by Ocean City. Even in the absence of acceptance, however, an easement may be implied from a plat reference despite the absence of a reference in the deed transferring title, *Williams Realty Co. v. Robey,* 175 Md. 532, 539-40, 2 A. 2d 683, 686 (1938); 3 R. Powell, Property ¶ 409, at 424-28 (1973); 26 C.J.S. *Dedication,* § 23 c, at 447-48 (1956). *Compare, Goodsell v. Lawson,* 42 Md. 348 (1875). There was also a finding that east-west streets running to the beach, at least as far north as 94th Street, had been similarly dedicated and accepted.

However, the chancellor also found as a fact that prior to the 1962 storm, the Developer's lots stood on high ground, were covered with grass and were not used by the public. There was a further finding that prior to the 1962 storm, the public had only used that portion of the littoral east of the

dunes on what was then lots 4 and 5, and that no witness other than Park's sole stockholder testified as to the use of lots 4 and 5 as they existed after 1962, a use which did not antedate 1966.[6]

Park and the State assign four reasons why the decree entered by the chancellor should be reversed, which we shall consider.

(i)

The area between the dune line and mean high water mark has been dedicated to the public.

Based on his findings, the chancellor concluded that there had been no express dedication of any area within the Developer's lot line: no such dedication was noted on the recorded plat; and the deed of easement to Worcester County did not contain an express dedication, but rather was a consent to the construction and maintenance of the dune. He concluded that dedication could not be implied, because there was no proof of a clear and unequivocal manifestation of an intent to dedicate. We think this conclusion was compelled by *Toney Schloss v. Berenholtz*, 243 Md. 195, 204-05, 220 A. 2d 910, 914 (1966); *Canton Co. v. Baltimore*, 106 Md. 69, 83-84, 66 A. 679, 680 (1907); and *Harbor Co. v. Smith*, 85 Md. 537, 541-42, [*South Baltimore Harbor & Improvement Co. v. Smith,*] 37 A. 27, 28 (1897).

The distinction between dedication and prescription cannot be lost. Implying a dedication solely through long public use without regard to any intent to dedicate on the part of the landowner is but a form of prescription, and as such, all of the requisites for prescriptive rights must be met. *Mt. Sinai Nursing Home, Inc. v. Pleasant Manor Corp.*, 254 Md. 1, 5-6, 253 A. 2d 915, 917-18 (1969). *But see Conway v. Prince George's County*, 248 Md. 416, 419, [*Conway v. Board of County Comm'rs,*] 237 A. 2d 9, 11-12 (1968).

---

6. This was Dr. Nicholas J. Kohlerman, who had built a house on lots 22 and 23, acquired by Park in 1966 and 1967, respectively.

### (ii)

The public has attained the right to use the area between the dune line and the mean high water mark through prescriptive use.

We believe that the chancellor was quite right when he rejected the contention that an easement had been acquired by prescription, relying on *Mt. Sinai, supra,* 254 Md. at 5-6, 253 A. 2d at 917-18. As Chief Judge Alvey said for the Court in *Thomas v. Ford,* 63 Md. 346, 351-52 (1885):

"It is certainly a settled doctrine in this State that public roads or ways of any kind can only be established by public authority, or by dedication, or by long user by the public, which, though not strictly prescription, yet bears so close an analogy to it that it is not inappropriate to apply to the right thus acquired the term prescriptive. Hence the existence of a public way may be established by evidence of an uninterrupted user by the public for twenty years; the presumption being that such long continued use and enjoyment by the public of such way had a legal rather than an illegal origin. *Day v. Allender,* 22 Md. 511. . . ."

As was the case in *Mt. Sinai, supra,* the law would support the petitioners, if the necessary facts were available. There was simply no testimony, other than Dr. Kohlerman's, as regards the public's use of lots 4 and 5. In fact, there was a clear inference that the lots had been used by no one prior to 1962 because of their topography. Such use as there may have been after the storm failed to meet the test of long user. *See also* Code (1974), Real Property Article § 13-113.

### (iii)

The public's interest in Maryland's coastal shores established through custom and grant requires that activities violative of the public trust be proscribed.

This contention seems to be based primarily upon Article

IV of the Charter of Maryland, 20 June 1632, by which Charles I granted to Caecilius Calvert, Lord Baltimore

> ". . . all islands and islets within the limits aforesaid, all and singular the islands and islets, from the eastern shore of the aforesaid region, towards the east, which have been, or shall be formed in the sea, situate within ten marine leagues from the said shore; with all and singular the ports, harbours, bays, rivers, and straits, belonging to the region or islands aforesaid, and all the soil, plains, woods, mountains, marshes, lakes, rivers, bays, and straits, situate, or being within the metes, bounds and limits aforesaid, with the fishings of every kind of fish, as well of whales, sturgeons, and other royal fish, as of other fish, in the sea, bays, straits or rivers, within the premises, and the fish there taken: . . ." 1 Maxcy, Laws of Maryland 1, 2 (1811).

and then subjected the grant to the reservation contained in Article XVI:

> "AND FURTHERMORE, of our more ample special grace, and of our certain knowledge, and mere motion, WE do, for US, our heirs and successors, grant unto the aforesaid now baron of Baltimore, his heirs and assigns, full and absolute power and authority to make, erect and constitute, within the province of Maryland, and the islands and islets aforesaid, such, and so many sea-ports, harbours, creeks, and other places of unlading and discharge of goods and merchandizes out of ships, boats, and other vessels, and of lading in the same, and in so many, and such places, and with such rights, jurisdictions, liberties and privileges, unto such ports respecting, as to him or them shall seem most expedient: And, that all and every the ships, boats, and other vessels whatsoever, coming to, or going from the province aforesaid, for the sake of

merchandizing, shall be laden and unladen at such ports only as shall be so erected and constituted by the said now baron of Baltimore, his heirs and assigns, any usage, custom, or any other thing whatsoever to the contrary notwithstanding. Saving always to US, our heirs and successors, and to all the subjects of our kingdoms of England and Ireland, of US, our heirs and successors, the liberty of fishing for sea-fish, as well in the sea, bays, straits, and navigable rivers, as in the harbours, bays, and creeks of the province aforesaid; and *the privilege of salting and drying fish on the shores of the same province; and for that cause, to cut down and take hedging-wood and twigs there growing, and to build huts and cabins, necessary in this behalf, in the same manner as heretofore they reasonably might, or have used to do. Which liberties and privileges, the said subjects of US, our heirs and successors, shall enjoy, without notable damage or injury in any wise to be done to the aforesaid now baron of Baltimore, his heirs or assigns, or to the residents and inhabitants of the same province* in the ports, creeks, and shores aforesaid, and especially in the woods and trees there growing. And if any person shall do damage or injury of this kind, he shall incur the peril and pain of the heavy displeasure of US, our heirs and successors, and of the due chastisement of the laws, besides making satisfaction." Maxcy, *supra*, at 7-8. (Emphasis supplied.) [7]

The scope of the rights reserved is strikingly reminiscent of Roman law.[8] This is not surprising, since Justinian's

7. The original Charter, in Latin, appears in 3 Archives of Maryland, Proceedings of the Council of Maryland, 1636-1667, at 3-12 (Browne ed. 1885).

8. T. Cooper, The Institutes of Justinian, Book 2, Title 1, 67-68 (1812):

"§ 1

"Things common to mankind by the law of nature, are the air, running water, the sea, and consequently the shores of the sea;

Institutes were well known in Britain by the 13th century. *See* 1 F. Pollock & F. Maitland, The History of English Law 119 (2d ed. 1905).

The petitioners argue, with some force, that fish cannot be salted or dried, or cabins or huts constructed, or twigs and branches gathered on the foreshore, which is subject to continuous tidal action, therefore placing some of it under water a considerable portion of each day. A fair reading of Article XVI's provisions, they say, contemplates the right of the public to carry on such activities on the littoral owned by others adjacent to the foreshore, seaward of the vegetation line, so long as there is no significant interference with an owner's rights.

It seems to us that there are obstacles which must be considered. First, was the right reserved only to the king, his heirs and his subjects? Second, does a fair reading of the Charter limit the reservation to the ocean shore? Third, did the reservation apply to the 17th century configuration of the shoreline, or as the shore receded westward, did property which formerly lay at a distance from the ocean become subject to the reservation? [9] Finally, may rights

---

no man therefore is prohibited from approaching any part of the sea-shore, whilst he abstains from damaging farms, monuments, edifices, & c. which are not in common as the sea is."

\* \* \*

"§ 3
"All that tract of land, over which the greatest winter flood extends itself, is the sea-shore."

\* \* \*

"§ 5
"The use of the sea-shore, as well as of the sea, is also public by the law of nations; and therefore any person may erect a cottage upon it, to which he may resort to dry his nets, and hawl them from the water; for the shores are not understood to be property in any man, but are compared to the sea itself, and to the sand or ground which is under the sea."

The Latin text of the Institutes uses the word *casa* in § 5 which is translated as *cottage*. Alternate translations are *cabin, shed,* or *hut.* The Latin text of the Maryland Charter uses the words *casa* (cabin) and "tuguriola." *Compare tugurium* (hut). *See* The White Latin Dictionary 97, 622 (1948).

**9.** *See* Hay v. Bruno, 344 F. Supp. 286 (D. Or. 1972); State ex rel.

oriented about the 17th century fishing industry be regarded as encompassing the uses to which a beach is customarily put 300 years later? [10]

Intriguing as these questions are, we find it unnecessary to consider them in this case for a very simple reason. What the petitioners are attempting to do here, under an assertion of the public's right to picnic and sunbathe on the dune, is to deny the Developer a use of his property to which he has an otherwise lawful right: the right to build to Ocean City's building limit line. This is the "notable damage or injury in any wise to be done . . . to the residents and inhabitants of the same province in the . . . shores aforesaid, . . ." which Article XVI of the Charter specifically proscribed. Accordingly, we do not reach the question of the type of incursion, if any, which might be permitted by the Charter.

As did the chancellor below, we decline to rely on the rule of *State ex rel. Thornton v. Hay, supra,* 254 Or. at 595, 462 P.2d at 676, that the right of the public to use a dry sand area contained within the legal description of a water front tract may be grounded solely on a custom of public use.

Insofar as Park sought to rest its claim on custom, we are quite satisfied to adopt the rationale explicated by the chancellor. No one, other than Dr. Kohlerman, alleged a right to venture upon the Developer's lots, and even he could go back no further than a half dozen years — certainly not "so long, that the memory of man runneth not to the contrary," 1 W. Blackstone, Commentaries *76.[11] Moreover, just as there is no way that the Developer can challenge the right of others to use the beach between the mean high water mark and its lot line, there is no way, under the facts of this case, that the use by the public of the beach east of

Thornton v. Hay, 254 Or. 584, 462 P. 2d 671 (1969) which recognized that the dry sand area might move as much as 200 feet in a single year.

**10.** *See* Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N. J. 296, 309-10, 294 A. 2d 47, 54-55 (1972); Degnan, Public Rights in Ocean Beaches: A Theory of Prescription, 24 Syracuse L. Rev. 935, 955-59 (1973).

**11.** Additionally, Blackstone notes that in order to be enforceable, a custom must be: continued, peaceable, reasonable, certain, compulsory, and consistent with other customs, 1 W. Blackstone, Commentaries *77-78.

the easterly lot line can be extended to the lot itself in a manner which would deny to the owner a use permitted by law and local regulation.

The petitioners attempt to buttress their argument by contending that the area between the mean high water mark and the dune line has become impressed with a public trust, either because of the substantial sums expended in restoring the dune line after the 1962 storm, or because recreational and environmental considerations would thereby be served.

The lower court rejected this argument, as do we. There was no evidence that the public had acquired any interest in lots 4 and 5, nor is any authority cited in support of the notion that such an interest may come into being simply as a consequence of the expenditure of public funds. Moreover, it is clear from the record that the army engineers regarded the work which was done at public expense as a necessary emergency measure in a disaster area, in order to bring back the situation which existed prior to the storm, so that the ocean highway, far west of the dunes, could be kept open as an evacuation route. Property owners received positive and unequivocal assurance that the work on the dune line would in no way affect the ownership, use, improvement, or disposition of their property — an assurance inconsistent with the idea that the work was undertaken to insure that the general public would be able to use a portion of the ocean front lots.

(iv)

Land inundated by mean high water reverts to State ownership: areas reclaimed by governmental efforts remain State property.

The first phrase of this proposition is a correct statement of the law of submergence, and is applicable when, as a result of gradual erosion, fast land becomes submerged. We are not called upon here to pass on the correctness of the second phrase, for which reliance is made on *Carolina Beach Fishing Pier, Inc. v. Town of Carolina Beach*, 277 N. C. 297, 177 S.E.2d 513 (1970) and on *People v. Hecker*, 179 Cal. App. 2d 823, 4 Cal. Rptr. 334 (1960).

The rule applicable to a gradual erosion is not applicable to an avulsion, defined as a sudden or violent change, which does not generally affect land boundaries, 1 H. Farnham, Law of Waters and Water Rights § 74, at 331-32 (1904); 11 C.J.S. *Boundaries* § 34, at 579-80 (1938); 56 Am. Jur. *Waters* § 477, at 892-95 (1945). The March, 1962 storm at Ocean City would clearly be classified as an avulsion. It was of short duration, flooding much of Ocean City at its height, and destroying or extensively damaging houses and other structures. When it was over, the waters receded, leaving most of the land unchanged, except for the disappearance of the dunes which had lined the beach. The idea that title reverted to the State once the land was temporarily flooded is simply not a tenable contention.

> *Decree affirmed, costs to be paid*
> *by petitioners.*

*Eldridge, J., dissenting:*

As the majority points out, this is the first time that the issue of the rights of private landowners and the public in the littoral or dry sand beach of the Atlantic Ocean has been presented to this Court. The majority, however, in upholding the landowner's right to build on the beach at the expense of the public's use of the beach, fails to give sufficient weight to the exceptional nature of the ocean beach, the various circumstances surrounding its use, and the historic and compelling public interest in the ocean beach.

Courts in other parts of the country, recognizing the unique resource of the ocean beaches, and the traditional public use of them, have recently been upholding the right of the public to continue to use the ocean beaches for swimming, fishing, strolling and sunbathing. In reaching this result, the cases have been based on several different grounds such as express dedication (*Gewirtz v. City of Long Beach*, 69 Misc. 2d 763, 330 N.Y.S.2d 495, 504-505 (Sup. Ct. 1972), *aff'd*, 45 A.D.2d 841, 358 N.Y.S.2d 957 (1974)); implied dedication (*Seaway Company v. Attorney General*, 375 S.W.2d 923, 935-937 (Tex.Civ.App. 1964)); customary rights

(*State ex rel. Thornton v. Hay*, 254 Or. 584, 462 P. 2d 671, 676-678 (1969); *County of Hawaii v. Sotomura*, 517 P. 2d 57, 61-62 (Haw. 1973); and *see City of Daytona Beach v. Tona-Rama, Inc.*, 294 So. 2d 73, 78 (Fla. 1974)); or prescriptive use (*Gion v. City of Santa Cruz*, 2 Cal. 3d 29, 465 P. 2d 50, 55-56, 59, 84 Cal. Rptr. 162 (1970); *Seaway Company v. Attorney General, supra*, 375 S.W.2d at 937-938).

I agree with parts (ii) and (iv) of the majority opinion, that no public rights in the subject beach area exist because of prescriptive use or because the land became temporarily flooded in 1962. However, I disagree with the conclusion in part (i) of the majority opinion that the public has no rights in the dry sand ocean beach by implied dedication. Furthermore, customary use of the ocean beach, contemplated from the time of Maryland's Charter, and discussed in part (iii) of the majority opinion is an important factor which, considered together with other circumstances, leads me to the conclusion that the public has by dedication the right to use the dry sand beach for swimming, fishing, sunbathing, and other normal beach activities.

The majority opinion, in not recognizing a public easement by implied dedication in the subject ocean beach above the mean high tide mark, fails to deal with the unique factors involved in this case. An examination of prior Maryland cases convinces me that the doctrine of implied dedication is fully applicable here.

Almost one hundred years ago, Judge Alvey (later Chief Judge) speaking for the Court in *McCormick v. Baltimore*, 45 Md. 512 (1877), made it clear that dedication of land to public use need not take any particular form and that the landowner's intent to dedicate his land to public use may be presumed from acts or conduct which estop him from denying the public's right. It was thus stated (45 Md. at 523):

> "It is now settled that it is not essential to a complete dedication that the legal title should pass from the owner, nor that there should be any grantee of the easement *in esse* to take the fee; nor is it necessary that there should be a deed or

writing in order to evidence the dedication; but if the owner of the land has done such acts *in pais* as amount to a dedication, he is thereby estopped from denying that the public have a right to enjoy what is thus dedicated to its use, or from revoking what he has declared by his acts."

And later (*id.* at 524):

"The evidence of such intention [to dedicate] is furnished in various ways; but . . . dedication will be presumed where the facts and circumstances of the case clearly warrant it . . . ."

In *Mayor and City Council of Baltimore v. Frick*, 82 Md. 77, 83, 33 A. 435 (1895), the Court emphasized that there are no general rules applicable to all cases of implied dedication, and that each case depends on its own facts and circumstances, saying:

"Indeed it has been found that it is very difficult to lay down any general rule applicable to all cases [of implied dedication]. It has been said 'that each individual case must be decided by itself, taking into consideration all the attendant circumstances, the condition of the respective parties and the acts, declarations and intentions of the landowner as manifested by his conduct. For it is largely on the ground of estoppel *in pais* that the principle of dedication rests.' "

The Court in *Lonaconing Ry. Co. v. Consol. Coal Co.*, 95 Md. 630, 634, 53 A. 420 (1902), reiterated that no particular act or formality is needed for dedication of land to public use, that the intent to do so need not be expressed in any particular manner, and that dedication may be implied from the landowner's conduct:

" 'There is no particular form or ceremony necessary in the dedication of land to public use. All that is required is the assent of the owner of the land and the fact of its being used for the purposes

intended by the appropriation.' *Cincinnati v. White,* 6 Pet. 431, 440; *Morgan v. Chicago & Alton R. R. Co.,* 96 U. S. 723. This assent need not be expressed in any particular manner, but it may be implied from the conduct of the owner of the land. *Elliott on Roads and Streets,* sec. 133; *Carr v. Kolb,* 99 Ind. 53; *Noyes v. Ward,* 19 Conn. 520; *Abcott v. Mills,* 3 Vt. 527. No conveyance of the land is necessary nor need there be any grantee *in esse* to take the title, 'but if the owner of the land has done such acts *in pais* as amount to a dedication he is thereby estopped from denying that the public have a right to enjoy what is thus dedicated to their use or from revoking what he has declared by his acts.' *McCormick v. Mayor,* 45 Md. 523; *Hiss v. B. & H. P. R. R. Co.,* 52 Md. 250. Dedication is purely a question of intention and any act or acts of the owner of the land clearly manifesting such intention is sufficient."

More recently, in *Smith v. Shiebeck,* 180 Md. 412, 419-420, 24 A. 2d 795 (1942), Judge Delaplaine for the Court pointed out that acquiescence in public use is a manifestation of an intent to dedicate a facility for public use, that such use need not be for the prescriptive period or any definite length of time, that the public use need not be hostile, and that each case depends upon all of the circumstances involved in that case:

"As dedication is purely a question of intention, any act of a landowner clearly manifesting such an intention is sufficient. . . . The intention to dedicate may be implied from the conduct of the landowner. If, for example, a person throws open a passage through his land, and makes no effort to prohibit persons from passing through it, and does not show by any visible sign that he wishes to preserve his right over it, his action is a manifestation of an intention to dedicate the highway to public use and he is presumed to have so dedicated it. Thus, the

question of dedication rests largely upon the ground of estoppel. . . . The right of the public to a road does not depend upon its continuous use for a period of twenty years or for any other definite length of time, but upon its use with the assent of the owner for such a period that the public accommodation and private rights might be materially affected by an interruption of such enjoyment. . . . Each particular case must be decided by considering the declarations of the landowner, his intentions as manifested by his acts, and all the other circumstances of the case. In our opinion, the bill of complaint in this case, alleging that the road in question is a public road, is not defective merely because it does not expressly allege that the public use of the road has been notorious and hostile."

Other cases setting forth these same principles are *Conway v. Prince George's County,* 248 Md. 416, 418-419, 237 A. 2d 9 (1968); *Toney Schloss v. Berenholtz,* 243 Md. 195, 204-205, 220 A. 2d 910 (1966); *Harlan v. Bel Air,* 178 Md. 260, 265, 13 A. 2d 370 (1940); *Canton Co. v. Baltimore City,* 106 Md. 69, 83-84, 66 A. 679 (1907); *Pitts v. Mayor and City Council of Baltimore,* 73 Md. 326, 332, 21 A. 52 (1891).

As these cases hold, there are few hard and fast rules with respect to implied dedication under Maryland law, and each situation must be viewed in light of its own peculiar circumstances. The circumstances warranting the conclusion that the general public of this State has a right to use the beach at Ocean City above mean high tide are as follows:

The Charter of Maryland (1632), as set forth in the majority opinion, indicated that the ocean beach was to have a unique status. The Charter certainly contemplated public use of the ocean beach, for it reserved to the subjects of England and Ireland, and their "successors," the "privilege of salting and drying fish on the shores of the same province; and for that cause, to cut down and take hedging-wood and

twigs there growing, and to build huts and cabins, necessary in this behalf, in the same manner as heretofore they reasonably might, or have used to do." As pointed out by petitioners and also in the majority opinion, these privileges reserved to the public required that the public be able to use the dry sand beach above the line of mean high tide.

Moreover, the evidence clearly showed that the beach area involved in this case had in fact been used by the general public for many years prior to this litigation. One witness, George Schoepf, the assistant captain of the Ocean City Beach Patrol, testified that an estimated 1,000 people per day used the beach between 70th and 71st Streets, of which the disputed area was a part, on some summer weekends. Although he could not give a count of the number of users of the portions of respondent's lots 4 and 5 which were a part of the dry sand beach, he did testify to the use of lots 4 and 5 by a portion of the crowds which used the 70th-71st Street beach. Another witness, Dr. Kohlerman, the sole stockholder in petitioner E. T. Park, Inc., the owner of the land directly west of lots 4 and 5, testified as to the "swimming, bathing, sunbathing, ball-playing, picnicking" by the public on lots 4 and 5. There was no evidence presented that respondent landowner or its predecessor in title took any action to discourage or prevent use of the beach by the public. While I do not suggest that mere acquiescence in the use by the public of a landowner's property, without more, constitutes an implied dedication, nevertheless it is an important circumstance indicating an intent to dedicate land such as this to public use. *Smith v. Shiebeck, supra.*

Another factor in this case is that the original plat, made in 1917, of the area involved in this litigation, designated a portion of that area bordering on the ocean as "beach." The 1940 revised plat (the Oceanbay City plat) also contained an area running along the shore which was designated as "boardwalk." The most recent plat of the area, submitted in 1963, also designated an area adjacent to the Atlantic Ocean as "beach." Although the sand beach in dispute is not within the area designated "beach" on the plats, because the beach has moved westward as a result of erosion, these plats show

a consistent recognition that the area immediately adjacent to the ocean was to be kept as beach.

The evidence also showed that prior to the 1938 completion of a paved road to the Delaware line, the beach in the area of dispute had been used as a public road. *See Seaway Co. v. Attorney General, supra,* 375 S.W.2d at 932, 935.

The expenditure of government funds for the provision of services on the beach area at issue in this case is a circumstance indicating that the public, as well as the property owners, understood that the beach was dedicated to public use. Testimony demonstrated that the entire beach, including the area at issue, has been kept clean by government authorities. Lifeguard services have been provided by the city at a point near the disputed area which protected swimmers using that part of the beach. Regulations governing the behavior of members of the public on the beach have been promulgated and enforced in the beach area here involved. The county and later the city provided patrolling of the beach. *See Gion v. City of Santa Cruz, supra,* 465 P. 2d at 53, 59.

Government expenditures were also made to preserve the beach in the disputed area. In 1938 the State and in 1953 the county erected sand fences along the length of the island to build up dunes to protect the beach. In 1954, an asphalt jetty was constructed at 70th Street to protect the beach near that point. Following the extensive damage to the 70th-71st Streets area caused by the storm of 1962, the Army Corps of Engineers rebuilt the dune line along the entire length of the beach, including the property in question. 1,050,000 cubic yards of sand were pumped from the bay to the beach for use in rebuilding the dunes. This operation cost over one and a half million dollars of public funds. Easements were obtained from all property owners to allow construction and maintenance of the dunes. *See United States v. Harrison County, Mississippi,* 399 F. 2d 485 (5th Cir. 1968).

Lastly, the understanding of the citizens of this State that the entire beach at Ocean City is open to the public should be

considered. Anyone who has visited Ocean City, and this would include most Marylanders, knows that no one has ever questioned his right to stroll the beach and swim at any point on the length of the island. This is an assumption on which the rapid and profitable development of Ocean City has been based. It is an assumption which must have been known to the respondents. When the respondent landowner allowed the public to use the dry sand beach, and accepted the government services and protections with respect to the beach, he was endorsing this widely held public belief.

The various factors listed above, taken together, lead me to the conclusion that the landowner and his predecessors in title have recognized the public's right to use and the public's use of the dry sand beach to such an extent, that an implied easement to the public for recreational purposes has been created. None of the above factors, taken alone, result in this conclusion, nor do any two of the factors compel this result. But all of the circumstances evaluated together create a total picture of an implied dedication by the landowner and an unmistakable acceptance by the general public. *See Seaway Company v. Attorney General, supra,* 375 S.W.2d at 935-937, where essentially similar circumstances led the Court of Civil Appeals of Texas to hold that the Texas public had an easement by implied dedication to use the beach along the Gulf of Mexico.

Because the Atlantic Ocean beach is a unique geographic phenomenon, because it is such a limited resource of the State of Maryland, and because the public involvement in it has been of a different character than that associated with other types of land, the result I would reach in this case is not at all inconsistent with prior Maryland law involving the issue of implied dedication of the shore. Thus in *Thomas v. Ford,* 63 Md. 346 (1885), this Court held that the defendant in that case acquired no easement, by either prescription or implied dedication, to store wood on the plaintiff's shore along the Patuxent River based upon the general public's use of that shore, which use had been acquiesced in by the plaintiff. One of the chief reasons in that case for denying an easement to the defendant for the storage of wood was that

such an easement would amount to an exclusive appropriation of the land, inconsistent with the general public's use of the shore. 63 Md. at 353. However, the Court also held that, for reasons of policy, merely permitting the public to use the shore should not give rise to an easement. Chief Judge Alvey stated for the Court in *Thomas* (*id.* at 354-355):

> "As appropriate to this case, we may repeat here what was said, with great force of reason by COWEN, J., in *Pearsall vs. Post*, that considering the great extent of shore lines within our State, and the long and uniform indulgence extended by the proprietors of those shores to those who have had occasion to use them for purposes connected with water transportation or fishing, a decision which should admit the possibility of turning such permissive enjoyment into prescriptive and absolute right on the part of the public, would open a field of litigation which no community could endure. And what is still worse in a moral point of view, it would be perverting neighborhood forbearance and kind indulgence to the destruction of important rights. Consequently, if it be once understood that this permissive indulgence of the proprietors of the shores may be construed into irrevocable privileges, restrictions and hinderances will inevitably follow, to avoid the possibility of such permissive use maturing into public adverse rights. The production of any such consequence surely ought not to be desired by anyone."

I fully agree with the above-quoted passage, that merely permitting the public to use the shore for boating, swimming or fishing should not in itself give rise to an easement. The same could be said with respect to a farmer permitting the public to hunt on his land, or any landowner permitting picnicking, hiking, etc. However, as pointed out above, the ocean beach presents an entirely different matter.

While Maryland's inland tidal shoreline measures over three thousand miles, its ocean shoreline is only thirty-five miles long. To recapitulate, from the time of the Charter of Maryland on, the ocean beach has had a unique status. Not only have the landowners acquiesced in the public's use of the beach, but they have accepted government services, protections and regulations with respect to the beach which are of a totally different character than the government services, protections and regulations provided for other types of privately owned land. Plats have consistently shown an area to be dedicated as "beach." The public and property owners of the State well understand that use of other types of land for recreational activities does not effect a dedication to the public. This is in stark contrast to the common understanding that the beach at Ocean City is a public beach.

In light of the consistent holdings of this Court that dedication of land to public use need not take any particular form, that it does not depend on hard and fast rules, that a landowner's intent to dedicate may be presumed from acts and conduct, and that each case depends upon its own facts and circumstances, I would reverse the decision below on the ground that the peculiar facts and circumstances associated with the ocean beach and its use, compel the conclusion that the dry sand beach at the front of respondent landowner's lots has been dedicated to recreational use by the general public.

Petitioners in this case argue that the respondent landowner should be held to have dedicated the beach to the line of dunes built after the 1962 storm. Since I would decide that only that part of the property which constituted a part of the dry sand beach used by the public was dedicated, the line urged by petitioners may be too inclusive. Other courts when faced with the question of what constitutes the "beach" for public recreational pursuits have settled on the line marked by the beginning of growth of vegetation. *County of Hawaii v. Sotomura, supra,* 517 P. 2d at 63; *Seaway Co. v. Attorney General, supra,* 375 S.W.2d at 927, 939; *State ex rel. Thornton v. Hay, supra,* 462 P. 2d at

672-673. This would be a logical method of delineating the "beach" since the vegetation line marks the level reached by the waters of the ocean often enough to prevent the growth of plants. On the other hand, if the evidence showed that in a particular area, the portion of the beach traditionally used by the public with the acquiescence of the adjoining landowners, and maintained by the public authorities, was east of the vegetation line, then that line of public use eastward of the vegetation line should be the limit of the public's easement in such area. I would reverse the decree below and remand for further proceedings consistent with the views herein expressed.